# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs February 17, 2016

## STATE OF TENNESSEE v. JOSEPH I. TOLBERT III
## a/k/a MICAH JOSHUA FORD

### Appeal from the Criminal Court for Knox County
### No. 93616    Bob R. McGee, Judge

### No.  E2015-00770-CCA-R3-CD – Filed May 27, 2016

The Defendant, Joseph I. Tolbert III,[1] was convicted by a Knox County Criminal Court jury of three counts of first degree felony murder, first degree premeditated murder, attempt to commit first degree murder, two counts of especially aggravated robbery, and two counts of especially aggravated burglary.  *See* T.C.A. §§ 39-13-202 (2014) (first degree murder), 39-13-403 (2014) (especially aggravated robbery), 39-14-404 (2014) (especially aggravated burglary), 39-12-101 (2014) (criminal attempt).  The convictions for felony murder and premeditated first degree murder were merged and the Defendant received an effective sentence of life plus twenty-two years.  On appeal, the Defendant contends that (1) the evidence is insufficient to support his convictions, (2) his convictions for especially aggravated burglary are statutorily barred, and (3) his convictions for especially aggravated burglary violate double jeopardy principles.  We affirm the judgments of the trial court relative to first degree felony murder, attempted first degree murder, and one of the especially aggravated robbery convictions.  We merge the convictions for especially aggravated burglary to reflect one conviction for aggravated burglary and reduce the second conviction for especially aggravated robbery to aggravated assault and remand for resentencing relative to these counts.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed
### in Part; Modified in Part; Case Remanded

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and ROBERT W. WEDEMEYER, J. joined.

---

[1] The record reflects that the indictment identified the Defendant as Joseph I. Tolbert III. The trial transcript reflects that the Defendant's legal name is Micah Joshua Ford and that the Defendant was known to the victims as "Keith."  The Defendant testified at the trial that he assumed the identity of Joseph Tolbert in order to procure a driver's license.  The judgments reflect the Defendant's name as Micah Joshua Ford, alias Joseph I. Tolbert III.  Because the Defendant was indicted as Joseph Tolbert, we will use this name on appeal.

J. Liddell Kirk (on appeal) and Thomas Slaughter (at trial), Knoxville, Tennessee, for the appellant, Joseph I. Tolbert III.

Herbert H. Slatery III, Attorney General and Reporter; Clarence E. Lutz, Senior Counsel; Randall E. Nichols, District Attorney General; and Kevin Allen, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case arises from a December 28, 2009 incident in which the Defendant entered the victims' apartment, robbed them, fatally shot Michael Cowen and stabbed Brittany Davis.

At the trial, Michael Mayes testified that he was the records keeper for the Knox County Emergency Communications District. The audio recording of a December 28, 2009 9-1-1 call made by Ms. Davis was played for the jury. In the recording, Ms. Davis told the operator that someone had just robbed them, that she had been stabbed "everywhere," and that her boyfriend had been shot, although later she said he was shot and stabbed. She said that her boyfriend was on the floor, that she did not know how many times he had been shot, and that she thought he was dead. When asked whether "they" kicked in the door, Ms. Davis responded affirmatively. Ms. Davis's responses became delayed, and she had to be asked questions repeatedly. She said that she did not know who robbed them. She told the operator that her daughter was at her grandmother's house. She stated that she locked the front door because she thought "he might come back" but could not unlock the door for the police. She asked the operator to hurry because she thought she was dying.

Brittany Davis testified that in December 2009, she and Mr. Cowan had been living together for four years, that she was engaged to Mr. Cowan, and that they had a daughter together. She said that in April 2009, they moved to a two-bedroom apartment and that the apartment had a front entrance, secured by a deadbolt, and a rear entrance. She stated that on December 27, Mr. Cowan went to work at a convenience store located at an apartment complex in which they previously lived and that she was aware Mr. Cowan was involved with marijuana at the previous apartment complex.

Ms. Davis testified that on December 27, she arrived home from work at 10:00 p.m. Ms. Davis said that their daughter was staying overnight with their daughter's great-grandmother. She stated that Mr. Cowan began playing a video game, that she left and bought a pack of cigarettes, and that she returned around 11:00 p.m. and fell asleep on the couch next to Mr. Cowan, who continued playing the video game.

Ms. Davis testified that she awoke to a "loud bang" and that she estimated it took three or four minutes to understand what was happening. She said that she saw "[l]arge

-2-

grades of light, just sparks, like fireworks but no sound" coming from the path to her front door. She stated that Mr. Cowan was in front of her and that he had been shot. She said that she saw him bleeding and "leaning forward grabbing his stomach" before he fell forward face down. She said that Mr. Cowan did not move after he fell. She stated that she felt someone was trying to kill her and that she decided against trying to escape because she did not want to be shot.

Ms. Davis testified that she attempted to hide under a table but that she was pulled up by her hair and a pistol was forced into her mouth. She said a man, later identified as the Defendant, was holding the pistol. She stated that the Defendant was wearing a mask that "bulged" in the back. She said that the Defendant pulled the pistol's trigger and that she heard clicking but that the pistol did not fire. Ms. Davis said the Defendant "slung [her] around," walked to the kitchen while holding her hair, and began stabbing her with a kitchen knife.

Ms. Davis testified that she asked the Defendant to stop stabbing her and that she talked to him about her then-eighteen-month-old daughter. She said that the Defendant began asking for guns and ammunition and that he had a northern accent. She stated that she recognized slang terms he used because she knew people from Brooklyn, New York, but that the Defendant did not have a Brooklyn accent. She said that she looked for money in the kitchen in an attempt to make the Defendant stop stabbing her. She stated that Mr. Cowan stored money and marijuana in containers hidden around the house and that she searched the kitchen and her bedroom. She said that the Defendant never released her, that she could see Mr. Cowan from the kitchen, and that Mr. Cowan did not make any noise or move.

Ms. Davis testified that when she went into her bedroom closet, she attempted to fight the Defendant, grabbed his face mask, and stretched it away from his face. She stated that she began screaming and that the Defendant told her, "Shut up, b----, before I kill you." She said that the closet light was on and that she recognized the Defendant. She stated that she knew the Defendant from the previous apartment complex as "Keith" and that she also knew a man she thought was the Defendant's brother. She said that she found two "bricks" of money in her nightstand, that she threw the money on her bed, and that the man took the money, threw her across the bed and into the bathroom, and ran away. Ms. Davis said that she heard the front door shut and that she began to walk toward the living room when she heard the front door open again.

Ms. Davis testified that she lay on the floor and tried to make herself stop breathing. She said that she saw the Defendant's feet run past her, that the Defendant returned and stabbed her, and that the Defendant stood over Mr. Cowan and shot him. After the Defendant left, Ms. Davis stated that she found her cell phone, called 9-1-1, and locked the front door. She said that she became angry because the 9-1-1 operator asked

-3-

many questions, the police were taking too long to arrive, and she thought she and Mr. Cowan were dying. She stated that she eventually unlocked the door for the police.

Ms. Davis testified that she was placed in a medically induced coma for three days, that she was told Mr. Cowan had died, and that she spoke to Knoxville Police Officer Nevin Long on December 31. She stated that she told Officer Long the Defendant's brother's name because she could not remember the Defendant's name. She said that she immediately identified the Defendant in a photograph lineup. Ms. Davis testified that before December 28, her front door did not contain bullet holes, that the dead bolt was not dented or damaged, that there were no bullets or cartridge casings in her home, and that her home was clean and free of blood spatter.

Ms. Davis testified that she worked at a restaurant and that the Defendant ate there every day. She said that she knew he drove a 2005 black Dodge Durango because he came through the drive-through window. She said that on December 24, the Defendant came to her apartment and knocked on the door. She stated that Mr. Cowan was present, that when she opened the door, she indicated her displeasure at seeing the Defendant and left, and that the Defendant was gone when she returned. She said that no blood was on the kitchen cabinets when she returned.

On cross-examination, Ms. Davis testified that she would recognize the Defendant's license plate because she saw the car every day and paid close attention to it due to her coworkers' thinking the Defendant was attractive. She said that she did not tell the 9-1-1 operator that the Defendant committed the crime because she was holding her fiancé and watching him die. She acknowledged telling the 9-1-1 operator her apartment number and that her daughter was at her grandmother's house. When asked why she did not identify the Defendant as her attacker to Officer Long when he spoke to her in the hospital, she said that she was disoriented. She acknowledged telling Officer Long that her attacker wore dreadlocks or braids that "had a swing to them," but said that her testimony that the attacker's hair was bunched up inside the mask was accurate because his hair "flatly hung out" of the mask and swung. She stated that she saw dreadlocks and knew they were long because they were gathered and bulging from inside the mask. She acknowledged that she told Officer Long she did not know whether her attacker took any money. She said that when she first spoke to Officer Long, she provided information to her best recollection at the time. She stated that she was correct when she told Officer Long that the gun had a sock over the barrel when it was forced into her mouth. She said that the gun was very large and that it knocked out one of her teeth. She said that after she stopped taking the medications after her release from the hospital, she remembered more details about the incident.

Ms. Davis testified that during her interview with Officer Long, she described the shooting as though she had heard gunshots. She said that she did not hear gunshots during the incident, although she knew a gun was being fired. She stated that to her

-4-

knowledge, no guns were kept in her home. She acknowledged that the police found a loaded AR-15 assault rifle in her daughter's bathroom and a fully loaded clip for the rifle on top of the refrigerator. She said Mr. Cowan understood that, given their daughter's young age, no guns were permitted in the home. She stated that before this incident, she knew the gun was not in her daughter's bathroom. She did not know how the gun or the clip came to be in her apartment but said she was certain they were not there before the incident. When asked why she did not identify the Defendant when Officer Long asked about her attacker's height, she said that she answered the question asked and that she was "in and out of it."

Ms. Davis testified that when she spoke to Officer Long she was "[v]ery disoriented, giving facts and . . . rambling at the same time." She said that although she told Officer Long she went to the bathroom to get her cell phone, she retrieved it from the living room couch. She stated that she could not hear gunshots when she tried to hide under the table and that the Defendant may have tried to shoot the gun. She said that her conversation with Officer Long did not cover events chronologically. She stated that she did not see the Defendant reload the gun after returning to the apartment and before shooting Mr. Cowan twice. She said that when she told Officer Long, "[He] put two more bullets in the gun and shot [Mr. Cowan] again and he left," she was indicating that Mr. Cowan was shot again and there were more bullets, either from another gun or the same gun. She stated that she knew money was kept in a greeting card hidden in her nightstand but that she did not know about the bricks of money. When asked why she did not tell Officer Long about the money in the nightstand, she said that she was not "fully back to myself." When asked how she could have been confused while simultaneously giving substantial details about her life, she responded that she was "going on about living when I felt like I was dying in my mind." She stated that she and Mr. Cowan generally kept the front door locked.

Ms. Davis testified that she believed that when the Defendant visited on December 24, he took a set of keys from the bar separating the kitchen and living room, that a set of keys went missing in the days preceding the incident, and that after the incident, the keys were found on the bar in plain sight. She stated that after her release from the hospital a week after the incident, her mother gave her her purse, which contained the keys. She said that she told Officer Long the keys had been missing after she found them but did not remember when she told him. Ms. Davis said that when she spoke with the 9-1-1 operator, she assumed the door had been kicked in because she heard a loud noise. She stated that after the loud noise, she did not hear anything else but that she saw the Defendant shoot Mr. Cowan.

Ms. Davis testified that the Defendant held her hair as she moved around the apartment and that she did not have to direct him to allow her to move. She stated that she was able to move freely reaching cereal and cracker boxes on the pantry shelf. She said that the black mask was a ski mask and that she pulled the mask away to see the

Defendant's face. She stated that even though none of the police reports mentioned a mask, she told the police "at some point" about the mask. She said that the stacks of money consisted of one hundred- and twenty-dollar bills. She stated that there could have been a bag of marijuana in the refrigerator but that she cooked in the kitchen immediately before the incident and did not recall seeing a bag of marijuana. She did not know a large bag of marijuana was in her freezer. She stated that she did not open the refrigerator or freezer during the incident. She said that she did not expect to find the stacks of money in the nightstand, that she threw the money onto the bed, and that she did not know whether the Defendant "missed" another stack of money in the nightstand.

Ms. Davis testified that she remembered telling an investigator more than one man was involved in the incident and that she only saw the Defendant. She noted, though, that she heard footsteps not belonging to the Defendant during the incident. She said that she told Officer Long there was only one attacker because she only saw the Defendant. She stated that she did not tell Officer Long about being held by her hair and searching the apartment because she was disoriented. She stated that she was certain the gun was covered by a sock and that she could not determine the type of gun. She said that she was sure no drugs were in the house prior to the incident because she and Mr. Cowan had been evicted previously due to Mr. Cowan's drug possession. She said she told Mr. Cowan she would end the relationship if he kept drugs in their home. She stated that if Mr. Cowan had drugs in the apartment, "he did it to where I was unaware of it."

On redirect examination, Ms. Davis testified that the sock covered the gun's barrel. She said that when she spoke to Officer Long, she had been on a ventilator and in a coma for three days, was taking pain medication, and was connected to a morphine drip. She stated that when she awoke, she had no recollection of speaking with Officer Long but that family members told her she had spoken with him.

Knoxville Police Sergeant Michael Fowler testified that on December 28, 2009, he responded to a shooting call around 4:30 a.m. He said the dispatch operator told him Ms. Davis indicated she would not come out of the apartment, which alerted him to the possible presence of the attacker in the vicinity or inside the apartment. Sergeant Fowler stated that he did not see anyone leaving the area around the apartment. He said when he arrived at the apartment four minutes later, no cars or people were in the apartment complex parking lot and the apartment door was shut. He stated that he was waiting for backup to arrive when Ms. Davis opened the door. He said that she had a cell phone in her hand, had blood "all over her," and acted "[h]ysterical, traumatized." He stated that he asked Ms. Davis to lie down because she was injured and asked her who was in the apartment. Sergeant Fowler said Ms. Davis responded that her boyfriend was inside, but when asked if anyone else was inside, she did not respond.

Sergeant Fowler testified that when he entered the apartment, he saw Mr. Cowan lying face up on the floor. Sergeant Fowler said that he called out to Mr. Cowan but that

Mr. Cowan did not respond. Sergeant Fowler stated that he and two additional officers found no one else inside the apartment. Sergeant Fowler said that Sergeant Karen Heitzel arrived and began processing the crime scene. Sergeant Fowler stated that Sergeant Heitzel secured the scene and that he searched the perimeter of the apartment complex.

Knoxville Police Officer Eddie Johnson testified that he processed the crime scene. He said that he arrived at 4:23 a.m. and that the apartment was secure. He stated that he took one set of photographs and waited for a search warrant before returning around 10:45 a.m. to take more photographs and continue gathering evidence. He said that he collected fingerprints from boxes of food and that although he did not examine the fingerprints, he learned the Defendant's fingerprints were not found on the items. He stated that all the latent or bloody fingerprints collected were consistent with Ms. Davis's fingerprints. He said that he collected DNA swabs from the kitchen cabinets, the living room wall, and a light switch inside the master bedroom closet.

Officer Johnson testified that $2400 in one hundred-dollar bills was recovered from the victims' nightstand and that $1658.25 was recovered from Mr. Cowan's body. Officer Johnson said that the officers removed cereal boxes from the top of the refrigerator after they obtained a search warrant and discovered a loaded rifle magazine.

Ninety-three photographs taken by Officer Johnson during his first visit to the apartment were received as exhibits. The photographs depicted the exterior of the apartment, including a blood-smeared cell phone on a welcome mat, evidence placards inside the apartment marking a bullet, bullet fragments, shell casings, and a bloody knife, the front door and front hallway of the apartment, the victims' daughter's bedroom, the living room, the kitchen, the laundry room, the master bedroom, the master bedroom closet, and the master bathroom. Cereal boxes were on top of the refrigerator, blood was visible on the living room carpet, and a large quantity of blood spatter covered a stack of video games in the corner. Blood drops were visible on the kitchen floor, on and inside the kitchen cabinets, on and under a kitchen drawer, and inside the front door. The front door frame, handle, and deadbolt were dented and scratched, and a bullet-shaped dent was visible below the deadbolt. A photograph of the top drawer of the nightstand showed a stack of one hundred-dollar bills and a greeting card. The cartridge casings, bullet fragments, and an intact bullet were received as exhibits.

Fifty-eight photographs taken by Officer Johnson after the search warrant was obtained were received as exhibits. The photographs depicted the top of the refrigerator with a visible loaded gun magazine. Other photographs depicted a bullet fragment, which had traveled through a roll of Christmas wrapping paper on the living room floor, and more bullet fragments underneath the corresponding section of carpet. Photographs documented bloody palm prints, smears of blood throughout the house, and a tooth in the living room surrounded by blood stains. A bag of marijuana and scales were inside the refrigerator. A knife similar to a knife found lodged in Mr. Cowan's neck was

photographed inside a kitchen drawer. A large loaded rifle with a round in the chamber was in a bathroom cabinet under the sink.

Officer Johnson testified that he examined the victims' cell phones. Ms. Davis's cell phone and phone records for both victims were received as exhibits. DNA swabs from inside the apartment, the bloody knife, and a box of crackers were received as exhibits.

Officer Johnson testified that he lifted a latent fingerprint from the cracker box, which belonged to Ms. Davis. He said that he collected other bloodstained boxes from the kitchen, the marijuana, and the electronic scales.

On cross-examination, Officer Johnson testified that he did not mark the location on the kitchen cabinet from which he took the DNA swab. He said that the shell casings had not been moved at the time they were photographed. He stated that the only item moved was the drawer of the nightstand, which officers opened. Officer Johnson stated that he could not determine the location of a shooter based on the location of the bullet fragments. He said that the couch was not damaged and that it appeared the bullet, the fragment of which went through the wrapping paper, was fired straight down. He stated that no fingerprints were recovered from the knife.

Officer Johnson testified that no blood was present on or inside the nightstand, inside the bedroom closet, inside the laundry room, or on the bed in the master bedroom. He said that the front door lock was dented and that the dead bolt was functional. He stated that generally, a door frame was damaged when the door was kicked in but that the victims' door was not damaged. He said that the dead bolt had to be turned manually and that the damage to the door would not have caused the dead bolt to unlock. He stated that the Defendant's fingerprints were not found in the apartment. He said that officers did not take fingerprints from the AR-15 rifle, the rifle clip, or the bag of marijuana.

On redirect examination, Officer Johnson testified that he and the officers searched the apartment for any place a .22-caliber bullet might have been located. On recross-examination, Officer Johnson testified that the bullets and shell casings appeared to be the same brand or type and were marked with the letter F. He said that on December 28, at 12:35 a.m., a text message was sent to Ms. Davis reading, "get him."

Tennessee Bureau of Investigation (TBI) Special Agent Jennifer Millsaps, an expert in serology and DNA science, testified that a DNA sample taken from the bloody knife matched Mr. Cowan's DNA and that the blood samples from the kitchen cabinet, living room wall, rear patio door, and master bedroom light switch matched Ms. Davis's DNA. She said the blood sample from below the kitchen drawer matched the Defendant's DNA. Mr. Cowan's fingernail clippings did not test positive for another person's DNA.

On cross-examination, Special Agent Millsaps testified that she could not determine how long a sample of blood had been on a surface before it was collected. She said that blood remained testable for months in most circumstances. She stated that she took blood from the handle and the blade of the knife and that only Mr. Cowan's DNA was present.

Robert Hankins testified that he worked at a muffler and brake shop and that on December 28, 2009, he wrote a receipt for a repair of front brakes, two rotors, two calipers, and front and rear brake pads, totaling $475.24. He said that the receipt indicated the bill was paid in cash. He identified an invoice time stamped 10:14 a.m. from his supplier for the same items and said the parts corresponded to a 2005 Dodge Durango. He said that the Defendant owned the vehicle and had been to the shop previously. Mr. Hankins said that the Durango was not "roadworthy" when the Defendant brought in the vehicle. Mr. Hankins stated that the Defendant arrived at the shop at 8:00 a.m. and that Mr. Hankins completed the work around 11:30 a.m. or 12:00 p.m.

On cross-examination, Mr. Hankins testified that he had performed work for the Defendant previously, that the Defendant had never given him trouble, that the Defendant was not upset or panicked that morning, and that the Defendant did not try to hurry Mr. Hankins.

Brady Newsome testified that he worked for a car repossession company and that in 2009, he received instructions from a finance company to repossess a 2005 Dodge Durango from the Defendant. Mr. Newsome stated that he had been looking for the Defendant's Durango for several months and that on December 28, 2009, Mr. Newsome was parked in his tow truck when he saw the Defendant's Durango. Mr. Newsome stated that he followed the Defendant closely, that the Defendant accelerated, and that "[it] got pretty intense." Mr. Newsome said he pulled up alongside the vehicle and recognized the Defendant from his driver's license photograph. Mr. Newsome said that he followed the Defendant for about twenty minutes and that Mr. Newsome had emergency lights activated on his truck. Mr. Newsome said that when they eventually stopped, the Defendant asked why Mr. Newsome was chasing him. Mr. Newsome stated that he told the Defendant the Durango was to be repossessed and that "a sigh of relief went over [the Defendant's] face." Mr. Newsome said that the Defendant led him to a residence, removed some personal belongings from the Durango, including a backpack and that the Defendant gave him the keys without incident. Mr. Newsome stated that another person assisted him by driving the Durango to a storage lot with a gated entrance.

Mr. Newsome testified that three or four hours later, the finance company called and told him to return the Durango to its owner because the loan had been repaid. He stated that before returning the Durango to the Defendant, he inventoried its contents. Mr. Newsome found boxes of new Nike tennis shoes "stacked from floor to ceiling . . .

thick as you could put them in there in the back hatch[.]" Mr. Newsome said that the boxes were stacked four or five boxes deep toward the driver's seat and that two large garbage bags full of used clothing were in the back seat. Mr. Newsome stated that he met the Defendant in a parking lot and returned the Durango. Mr. Newsome identified an invoice for $675 addressed to the finance company for the repossession.

On cross-examination, Mr. Newsome testified that he first saw the Defendant around 10:00 a.m., although he said that it could have been around lunchtime. He stated that he returned the car to the Defendant around 4:00 or 5:00 p.m. Mr. Newsome said that he opened four or five shoe boxes and that the boxes only contained tennis shoes and tissue paper. He did not know whether the shoes were all the same size but said that all of them appeared to be adult-sized.

Barry Smith testified that he worked at a finance company and that the Defendant was one of his customers. He identified a receipt from December 28, 2009, at 2:29 p.m., in which the Defendant paid $1420 cash to redeem his Durango. Mr. Smith said the Defendant was always past due in his payments and that the last payment had been made in August or September 2009. The receipt was received as an exhibit. On cross-examination, Mr. Smith testified that the Defendant had always paid his bill even if he paid it late and that the Defendant would not have known in advance the Durango would be repossessed.

Knoxville Police Officer Nevin Long testified that in 2009, he was an investigator for the Major Crimes Unit and that as part of the investigation, he visited the hospital multiple times in an attempt to speak with Ms. Davis but that she was in a medically induced coma until December 31. He stated that he spoke with Ms. Davis on December 31 and that Ms. Davis was in a critical care unit, had been awake for a short time, and was "hooked up to several medical devices." He said Ms. Davis described her attacker and identified him as the Defendant's close friend's brother. She told Officer Long that the Defendant's brother "had been around" the previous apartment complex and had been arrested recently on drug-related charges. Officer Long stated that he identified the Defendant's close friend and identified the Defendant as "Keith." Officer Long said that he and another officer went to an address associated with Keith to conduct a "knock and talk" investigation. Officer Long stated that they spoke with the homeowner, who indicated that Keith had abandoned the property several months previously, that the homeowner consented to a search of Keith's abandoned personal effects, and that the officers found a letter addressed to Joseph Tolbert among the effects.

Officer Long testified that when he entered the name Joseph Tolbert into various databases, he found the Defendant's driver's license record and created a photograph lineup using the Defendant's photograph. He said that when he showed the lineup to Ms. Davis, she immediately identified the Defendant as the attacker. Officer Long said that after he obtained an indictment, he determined that the Defendant had been arrested in

DeKalb County, Georgia. Officer Long stated that he and another officer traveled to Georgia and interviewed the Defendant.

Officer Long testified that during the interview, the Defendant did not admit involvement in Mr. Cowan's death, that the Defendant said he was acquainted with Mr. Cowan because he had tried to sell Mr. Cowan an item, and that the Defendant was "very desperate for money" to repair his Durango. Officer Long said the Defendant told him that the Defendant and Mr. Cowan never met in person in connection with the sale, that they only spoke on the telephone, and that the Defendant had not seen Mr. Cowan in months. Officer Long stated that the Defendant told him about the repairs to his Durango but did not mention paying to redeem the truck after it was repossessed. Officer Long said that after the Defendant's arrest, Mr. Newsome called him to report his interaction with the Defendant on December 28 when Mr. Newsome repossessed the Durango.

Officer Long identified handwritten records he made of the contents of the Defendant's two cell phones, and the records were received as exhibits. Officer Long said that at the time the phones were collected, neither had active service.

On cross-examination, Officer Long agreed that initially, the officers considered the case a possible domestic disturbance. He said the victims' neighbor told an officer that she heard gunshots coming from the victims' apartment four or five nights before the incident and that the victims were always fighting. Officer Long said that a rumor in the community attributed the incident to another man, that the man did not match Ms. Davis's description of the attacker, and that the man was eliminated as a suspect. Officer Long stated Ms. Davis did not tell him that her attacker wore a mask until the week before the trial. He said that Ms. Davis described her attacker as an African-American man with shoulder-length dreadlocks or braids and that when Officer Long saw the Defendant in Georgia, the Defendant matched this description.

Officer Long testified that had Ms. Davis told him the gunshots were not audible, he would have noted it in his report. He said that Ms. Davis told him about her missing house keys several days to a couple weeks after their first conversation. Officer Long stated that he did not note the keys in his reports because "it never seemed to match up with any of the facts[.]"

Dr. Steven Cogswell, an expert in forensic pathology, testified that he conducted Mr. Cowan's autopsy. He said that the toxicology analysis showed the presence of marijuana. He stated that Mr. Cowan suffered gunshot wounds to the head, face, chest, and left arm, and a stab wound to the neck. He said that the gunshot wounds were inflicted by the same caliber bullet and fired from an undetermined distance. He said that the stab wound punctured the jugular vein. He stated that more than a quart of blood was found in the chest and that accumulating that much blood, given the lack of damage to major blood vessels in the chest, took time. He said that none of the injuries were

immediately fatal and that death would have taken between minutes and one hour. He stated that the cause of death was multiple gunshot wounds and a stab wound and that the manner of death was homicide.

Dr. Cogswell testified that the lack of injuries to Mr. Cowan's hands indicated he was "not in a fistfight." Dr. Cogswell noted contusions surrounding the gunshot wounds, which indicated the wounds were inflicted before death.

On cross-examination, Dr. Cogswell testified that Mr. Cowan had torn fingernails not containing dirt or residue, indicating that Mr. Cowan had recently fought with someone. He said it was possible Mr. Cowan had a physical altercation with the person who attacked him. On redirect examination, Dr. Cogswell said that the injuries could have been consistent with Mr. Cowan's trying to barricade a door against an intruder.

The Defendant testified that he used several different names, including Keith, and that he met Mr. Cowan when the Defendant moved to Knoxville from Maryland in 2005. The Defendant said that at the time, he periodically stayed with his cousin, with whom Mr. Cowan was in an "off and on type relationship" before Mr. Cowan's relationship with Ms. Davis. The Defendant stated that he and Mr. Cowan were friendly acquaintances but not friends. The Defendant said that he was close with members of Mr. Cowan's family. He stated that he and Mr. Cowan never had a conflict.

The Defendant testified that Mr. Cowan sold marijuana in "smoking quantities." The Defendant said that he sold crack cocaine and that in December 2009, the Defendant planned to move to Atlanta, Georgia. The Defendant stated that he split his time between an apartment in Knoxville and his girlfriend's house in Charlotte, North Carolina. He stated that on December 28, 2009, he had to return his key to his landlord and that it was important to have his car repaired because he was in the process of moving. Regarding the tennis shoes, the Defendant said that he owned many shoes and clothes but that the shoes and some of his clothes were stolen from his Knoxville apartment. He stated that if the car had not been repossessed that day, he would not have paid the finance company the money he owed. He said that he tried to have his car repaired before December 28, that the repairs were going to take too long, and that he did not have enough money to pay for the repairs. The Defendant denied being "flat broke."

The Defendant testified that he had six flat screen televisions and that he decided to sell some of the televisions. The Defendant said that he talked to "him" about one of the televisions on "the day it turned into something else" and that "he" asked the Defendant about "something else." The Defendant denied being desperate for money on December 27 or knowing his car would be repossessed on December 28. The Defendant said that he and Mr. Cowan began interacting more often in late 2009 because the Defendant came into a quantity of marijuana. The Defendant was concerned he would get caught with it because of the smell, and the Defendant's close friend, who was also

-12-

Mr. Cowan's marijuana supplier, had gone to jail. The Defendant stated that he sometimes paid his bills late and that he earned money from various sources. He noted, though, that he and his girlfriend had many bills and that he was the only one contributing to their payment.

The Defendant testified that he had been to Mr. Cowan's apartment a few times, including one visit around Christmas 2009, although he did not remember the day. He said that the visit lasted for five or ten minutes. He did not know if he had a cut on his hand when he visited and said he may have cut his hand with a razor blade when slicing a brick of marijuana. The Defendant stated that he injured his hand on a skateboard but could not say whether that injury was the source of the DNA found in the victims' apartment. The Defendant denied being at the victims' apartment and shooting the door on December 28.

The Defendant testified that he and Ms. Davis were not friendly and that he did not frequent the restaurant where she worked. The Defendant said that Ms. Davis did not like him because she tried to talk to the Defendant and he ignored her. The Defendant denied visiting the victims' apartment on Christmas Eve. The Defendant said that if he needed financial help, he thought Mr. Cowan would have helped because the Defendant had helped people in Knoxville. The Defendant said that he had "absolutely no reason" to take anything from Mr. Cowan and that the Defendant knew enough people in the drug trade that he did not need to "kill somebody for their money."

On cross-examination, the Defendant testified that upon arrival in Knoxville, he assumed the identity of an acquaintance, Joseph Tolbert, in order to obtain a driver's license, and that the Defendant had a poor driving record. He acknowledged that when he came to Tennessee, he had recently been released on parole for convictions in Maryland for assault with the intent to maim and weapon possession. When asked whether he stated an intent to rob Mr. Cowan on October 31, 2009, the Defendant did not audibly answer. The Defendant said that before he left Knoxville on December 28, he knew of Mr. Cowan's death and Ms. Davis's critical state. The Defendant acknowledged telling Officer Long that he was broke, that he needed to sell a television, and that the Defendant was "blowing up [Mr. Cowan's] phone" in an attempt to arrange the sale. The Defendant said that he knew Mr. Cowan had cash and that the Defendant needed $450 to have his brakes repaired. The Defendant denied telling Officer Long that his car was inoperable and said his brakes were making noise. The Defendant acknowledged paying for the brake repair and redeeming his vehicle with cash. The Defendant acknowledged having many pairs of tennis shoes in his vehicle and said he had worn some of the shoes.

The Defendant testified that he introduced himself in the community as a close friend's brother and that in December 2009, the close friend was jailed for a drug charge. The Defendant agreed that if Ms. Davis referred to the Defendant's close friend's brother, she was referring to the Defendant. The Defendant stated that his name was on the lease

-13-

for his Knoxville apartment, that he did not know how many months' rent he owed when he left, and that his two prior attorneys failed to contact his landlord to obtain documentation of his lease.

The Defendant testified that he could only speculate how his blood came to be in the victims' kitchen and that he and Mr. Cowan never fought. The Defendant stated that on one occasion, Mr. Cowan shook the Defendant's hand so hard that the Defendant's hand bled. The Defendant said that "purp" was marijuana with "purple haze in it," that it was expensive, and that it was known on December 28 that Mr. Cowan had obtained a quantity of it. The Defendant denied knowing that Mr. Cowan had $25,000 cash in his apartment. The Defendant noted, though, that he knew Mr. Cowan had an unspecified large amount of cash. The Defendant denied knowing Mr. Cowan had an AR-15 rifle in his apartment, killing Mr. Cowan, stabbing Ms. Davis, and taking money and marijuana from the apartment.

Upon this evidence, the Defendant was convicted as charged. The trial court imposed an effective sentence of life plus twenty-two years. This appeal followed.

## I. Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support his convictions, arguing only that the evidence did not establish the Defendant's identity beyond a reasonable doubt because conflicts existed in Ms. Davis's testimony and because Ms. Davis was not credible. The Defendant does not argue the State failed to establish the elements of the offenses for which he was convicted. The State responds that the evidence is sufficient.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn.

2009)). Proof of identity may be established through circumstantial evidence alone when the facts are "'so clearly interwoven and connected that the finger of guilt is pointed unerringly at the Defendant and the Defendant alone.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citing *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002) (quoting *State v. Smith*, 868 S.W.2d 561, 569 (Tenn. 1993)). As with direct evidence, a jury must weigh circumstantial evidence, any inferences to be drawn from it, and how the evidence contributes to a determination of guilt or innocence. *State v. Echols*, 382 S.W.3d 266 (Tenn. 2012) (citing *Rice*, 184 S.W.3d at 662).

In the light most favorable to the State, the evidence reflects that although Ms. Davis did not identify the Defendant as her attacker in the 9-1-1 call, she identified him when she awoke in the hospital by naming the Defendant's close friend, whom she thought was the Defendant's brother. She did not hesitate when choosing the Defendant's photograph from a lineup and when identifying the Defendant as Keith. The Defendant acknowledged that when Ms. Davis referred to Keith, she referred to the Defendant. Ms. Davis testified that she saw the Defendant's face during the stabbing when she pulled his ski mask away from his face. She said that she saw the Defendant regularly at her workplace and that the Defendant had been at her apartment on December 24. The Defendant's DNA was found on a kitchen cabinet at the victims' apartment. In spite of having made no payments on his vehicle loan for several months, the Defendant paid almost $1900 in cash for repairs to the vehicle and for redeeming his Durango the morning after the incident. A large quantity of cash was taken from the victims' apartment. Mr. Newsome testified that the Defendant's car's trunk was full of new tennis shoes in boxes and that large garbage bags of clothing were in the backseat. The day after the incident, the Defendant left the state and was arrested in Georgia.

We conclude the evidence sufficiently established the Defendant's identity as the attacker. Any conflicts in Ms. Davis's testimony were resolved in favor of the State by the jury's verdict. The Defendant is not entitled to relief on this basis.

## II. Especially Aggravated Burglary

The Defendant contends that his two convictions for especially aggravated burglary should be reduced to aggravated burglary because the applicable statute prohibits more than one conviction when the convictions are based upon the same conduct. The Defendant argues that the serious bodily injury to Mr. Cowan was used for Count 6, especially aggravated burglary, Counts 1, 2, and 3, felony murder, and Count 4, premeditated murder, and that the serious bodily injury to Ms. Davis was used for Count 9, especially aggravated burglary, and Count 8, especially aggravated robbery. The State has not addressed this argument in its brief.

As a preliminary matter, we note that the Defendant raises this issue for the first time on appeal, but we conclude that consideration of the issue is necessary to do substantial justice. *See* T.R.A.P. 36(b).

Especially aggravated burglary is defined, in relevant part, as burglary of a habitation where the victim suffers serious bodily injury. T.C.A. § 39-14-404(a)(1), (2). Aggravated burglary is defined as the burglary of a habitation. *Id.* § 39-14-403 (2014). Burglary is defined as entering without the owner's effective consent a building other than a habitation "not open to the public, with intent to commit a felony, theft, or assault[.]" *Id.* § 39-14-402(a)(1) (2014). A habitation is "any structure . . . designed or adapted for the overnight accommodation of persons[.]" *Id.* § 39-14-401(1)(A) (2014).

Tennessee Code Annotated section 39-14-404(d) states, "Acts which constitute [especially aggravated burglary] under this section may be prosecuted under this section or any other applicable section, but not both." This section prohibits convictions for both especially aggravated burglary and another offense involving serious bodily injury when the injury in both convictions is based upon the same conduct. *See State v. Holland*, 860 S.W.2d 53, 60 (Tenn. Crim. App. 1993). This court has held that when serious bodily injury to a victim is used to convict a defendant of both especially aggravated burglary and another offense requiring serious bodily injury, the especially aggravated burglary conviction must be reduced to aggravated burglary. *See State v. Steven Woodrow Johnson*, No. M2011-00859-CCA-R3-CD, 2012 WL 3877787, at *12 (Tenn. Crim. App. Sept. 7, 2012), *perm. app. denied* (Tenn. Feb. 13, 2013) (holding that Code section 39-14-404(d) precludes a conviction for especially aggravated burglary when the act of killing the victim for the felony murder conviction constituted the serious bodily injury element of the especially aggravated burglary conviction); *see also State v. Michael Allen Gibbs*, No. W2012-00800-CCA-R3-CD, 2013 WL 3324957, at *6 (Tenn. Crim. App. June 26, 2013), *perm. app. denied* (Tenn. Nov. 14, 2013); *State v. Antonio Jamarc Warfield*, No. M2011-01235-CCA-R3-CD, 2012 WL 4841546, at *15 (Tenn. Crim. App. Oct. 5, 2012).

In this case, Mr. Cowan's killing was the basis for the murder convictions in Counts 1, 2, 3, and 4, and the serious bodily injury element of Count 6, especially aggravated burglary. We conclude that the conviction in Count 6 must be reduced to aggravated burglary.

Likewise, Ms. Davis's stabbing was the basis for the serious bodily injury elements of the especially aggravated robbery and the especially aggravated burglary convictions relative to Ms. Davis. Especially aggravated robbery is defined as robbery "[a]ccomplished with a deadly weapon . . . [w]here the victim suffers serious bodily injury." T.C.A. 39-13-403. Robbery is defined as the "intentional or knowing theft of property from the person of another by violence or putting the person in fear." *Id.* 39-13-401 (2014). Theft of property occurs when "with intent to deprive the owner of property,

the person knowingly obtains or exercises control over the property without the owner's effective consent." *Id.* 39-14-103 (2014).

Because Ms. Davis's stabbing constituted the serious bodily injury elements in Count 8, especially aggravated robbery, and in Count 9, especially aggravated burglary, we conclude that conviction in Count 9 must be reduced to aggravated burglary. *See Holland*, 860 S.W.2d at 53.

### III. Double Jeopardy

The Defendant contends that, as modified, his two convictions for aggravated burglary violate double jeopardy principles, arguing that the convictions were based upon the entry of only one habitation. He requests the convictions be merged. The State responds that the convictions were based upon separate conduct because the Defendant initially entered the apartment with the intent to commit a theft, left, and entered again with the intent to kill the victims.

The Fifth Amendment of United States Constitution and Article I, section 10 of the Tennessee Constitution provide that no person should be put "in jeopardy of life or limb" twice for the same offense. U.S. Const. amend. V, Tenn. Const. art. I, § 10. Double jeopardy principles proscribe multiple punishments for the same conduct. *See State v. Watkins*, 362 S.W.3d 530, 541-42 (Tenn. 2012). Multiple punishment claims generally arise when, in connection with a single prosecution (1) the defendant is convicted of multiple offenses, or (2) the defendant is convicted of multiple counts of the same offense. *Id.* at 543.

The latter, "unit-of-prosecution" claims, "arise when defendants who have been convicted of multiple violations of the *same* statute assert that the multiple convictions are for the 'same offense.'" *State v. Watkins*, 362 S.W.3d 530, 543 (Tenn. 2012) (emphasis in original). "The legislature has the power to create multiple 'units of prosecution' within a single statutory offense, but it must do so clearly and without ambiguity." *State v. Lewis*, 958 S.W.2d 736 (Tenn. 1997). When considering a unit-of-prosecution claim, "courts must determine 'what the legislature intended to be a single unit of conduct for purposes of a single conviction and punishment.'" *Watkins,* 362 S.W.3d at 543 (internal citation omitted). If legislative intent relative to the unit of prosecution is ambiguous, a court should resolve the ambiguity against the conclusion that multiple units of prosecution are authorized. *Id.* (citing *Gore v. United States,* 357 U.S. 386, 391-92 (1958)). A court determines legislative intent by examining "the language of the statute, its subject matter, the object and reach of the statute, the wrong or evil which it seeks to remedy or prevent, and the purpose sought to be accomplished in its enactment." *Lewis*, 958 S.W.2d at 739 (quoting *Mascari v. Raines,* 415 S.W.2d 874, 876 (Tenn. 1967)).

In this case, the Defendant was convicted in Counts 6 and 9 of especially aggravated burglary, which we have reduced to two counts of aggravated burglary. Tennessee courts have not had occasion to consider the intended unit of prosecution for burglary.

As relevant to this case, the elements of aggravated burglary are (1) entry, (2) of a habitation, (3) with the intent to commit a felony, theft, or assault and (4) the lack of consent from the property owner. *See State v. Terry*, 118 S.W.3d 355, 358 (Tenn. 2003). We note that the statute governing burglary is located in the section of the Code entitled "Offenses Against Property." We conclude that given the plain language of Code sections 39-14-402 and -403 and the designation of burglary as an offense against property, the legislature intended the unit of prosecution for burglary to be the number of entries, not the number of inhabitants inside a habitation.

In this case, Ms. Davis testified that the Defendant entered the apartment twice, but due to the manner in which the State chose to indict the two burglary offenses, we cannot conclude that the evidence was sufficient to sustain two convictions for aggravated burglary. Relative to Count 6, the especially aggravated burglary conviction relating to Mr. Cowan, the indictment specified that the Defendant "did unlawfully and knowingly enter the habitation of [Mr. Cowan] without his effective consent . . . did commit Theft and did cause serious bodily injury to [Mr. Cowan]." Relative to Count 9, the especially aggravated burglary conviction relating to Ms. Davis, the wording of the indictment was identical except for the substitution of Ms. Davis's name. Although the State argues on appeal that the Defendant intended to kill the victims upon his second entry into the apartment, the indictment does not reflect a second intent. Because an intent to commit a felony, theft, or assault is an element of the offense, this election was not surplusage that we may overlook. Surplusage is language present in the indictment without which an offense would still be sufficiently charged. *State v. Marsh*, 293 S.W.3d 576, 588 (Tenn. Crim. App. 2008). If, however, omission of language from an indictment would render the offense insufficiently charged, the State must prove the offense to the degree of detail it set out in the challenged language. *Id*.

Likewise, a second intent was not presented during the trial or articulated in the jury instructions. In the indictment, the State elected theft, not assault or a felony, as the underlying offense that the Defendant intended to commit in both counts of especially aggravated burglary, and the jury found that two burglaries were committed during the course of a single theft. The State may not raise an alternative theory of the case for the first time on appeal because doing so would deprive the Defendant of constitutionally effective notice.

Our federal and state constitutions require a criminal defendant be provided information of "the nature and cause of the accusation." U.S. Const. amend. VI; Tenn. Const. art. I, § 9. Generally, an indictment is valid if it contains adequate information

-18-

"(1) to enable the accused to know the accusation to which answer is required, (2) to furnish the court adequate basis for the entry of a proper judgment, and (3) to protect the accused from double jeopardy." *State v. Hill*, 954 S.W.2d 725, 727 (Tenn. 1997) (citing *State v. Byrd*, 820 S.W.2d 739, 741 (Tenn. 1991); *VanArsdall v. State*, 919 S.W.2d 626, 630 (Tenn. Crim. App. 1995); *State v. Smith*, 612 S.W.2d 493, 497 (Tenn. Crim. App. 1980)). Furthermore, Tennessee Code Annotated section 40-13-202 requires an indictment to "state the facts constituting the offense in ordinary and concise language . . . in a manner so as to enable a person of common understanding to know what is intended and with that degree of certainty which will enable the court, on conviction, to pronounce the proper judgment." T.C.A. § 40-13-202 (2014).

In this case, the "ordinary and concise language" of the indictment specified that the Defendant entered the victims' apartment to commit a theft. The Defendant did not receive notice that he would have to prepare a defense against a burglary charge in which he intended to kill the victims. Therefore, we consider the sufficiency of the evidence supporting the burglary convictions as indicted.

The evidence presented at the trial reflects that the sole theft occurred during the first entry when Ms. Davis threw the stacks of money on the bed and the Defendant took the money. We conclude that the evidence is insufficient to support two convictions for aggravated burglary. The Defendant entered a habitation and committed a single theft, regardless of the number of inhabitants injured in the process. We therefore conclude that Counts 6 and 9 should merge into a single conviction for aggravated burglary.

### IV. Especially Aggravated Robbery

Although neither party raises the issue on appeal, upon further review of the record, we conclude as a matter of plain error that the Defendant's convictions for especially aggravated robbery violate double jeopardy principles. *See* T.R.A.P. 36(b).

Especially aggravated robbery is defined as robbery "[a]ccomplished with a deadly weapon . . . [w]here the victim suffers serious bodily injury." T.C.A. 39-13-403(a)(1), (2). Robbery is defined as the "intentional or knowing theft of property from the person of another by violence or putting the person in fear." *Id.* 39-13-401(a). Theft of property occurs when "with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." *Id.* 39-14-103(a) (2014).

A robbery can involve the taking of property from the physical body of a person, in which a person has actual possession of the property, or from a person's immediate presence or the general area in which the victim is located, in which the person has constructive possession of the property. *See Jones v. State*, 383 S.W.2d 20, 24 (Tenn. 1964) (concluding that the theft of items while the victim was restrained in another room

-19-

constituted robbery); *Morgan v. State*, 415 S.W.2d 879, 881 (Tenn. 1967) (concluding that the "fact the goods and money were not taken from the person of the victims is no defense" to robbery when the victims were restrained while their house was ransacked); *State v. Howard*, 693 S.W.2d 365, 368 (Tenn. Crim. App. 1985) (citing *Jones,* 383 S.W.2d at 20; *State v. Miller*, 608 S.W.2d 158 (Tenn. Crim. App. 1980)); *see also State v. Nix*, 922 S.W.2d 894, 900 (Tenn. Crim. App. 1995) (detailing the limitations of the phrase "from the person of another" in Tennessee jurisprudence).

This court has concluded that in cases of multiple robbery convictions, "the proper unit of prosecution for robbery in Tennessee is the number of takings, i.e. the number of thefts," and that defendants who put multiple people in fear during the course of one theft may be convicted of aggravated assault in addition to the robbery conviction to acknowledge each victim. *State v. Franklin*, 130 S.W.3d 789, 797-98 (Tenn. Crim. App. 2003); *see State v. Michael Lebron Branham*, No. E2014-02071-CCA-R3-CD, 2016 WL 106603, at \*11 (Tenn. Crim. App. Jan. 8, 2016) (holding that convictions for aggravated robbery of a male victim and aggravated assault of a female victim were proper when money was only taken from the male victim).

Aggravated assault, in relevant part, is defined as assault involving the use of a deadly weapon or in which the victim suffers serious bodily injury. T.C.A. 39-13-102(a)(1)(A)(i), (iii) (Supp. 2009) (amended 2010, 2011, 2013, 2015). Assault, in relevant part, is defined as intentionally or knowingly causing bodily injury to another. *Id*. 39-13-101(a)(1) (Supp. 2009) (amended 2010, 2013).

In this case, Ms. Davis testified that to her knowledge, only one theft occurred during which the Defendant took the money that Ms. Davis removed from the nightstand and threw on the bed. Because Ms. Davis testified that she was unaware of the money's presence in her nightstand and that Mr. Cowan hid money and marijuana around the house, a jury could have found beyond a reasonable doubt that the property taken belonged to Mr. Cowan. The record reflects that the Defendant shot Mr. Cowan and then took his money from another room in the apartment. We conclude that the evidence is sufficient to support the conviction in Count 5, the especially aggravated robbery of Mr. Cowan. However, because only one theft occurred, we conclude that the conviction in Count 8, the especially aggravated robbery of Ms. Davis, must be reduced to aggravated assault. *See Franklin*, 130 S.W.2d at 798. Therefore, we remand for the entry of an amended judgment reflecting a conviction for aggravated assault in Count 8 and for the imposition of a sentence.

In consideration of the foregoing and the record as a whole, we affirm the first degree felony murder convictions in Counts 1, 2, and 3, the first degree premeditated murder conviction in Count 4, the attempted first degree murder conviction in Count 7, and the especially aggravated robbery conviction in Count 5. We reduce the conviction in Count 8 to aggravated assault. We modify the convictions in Counts 6 and 9 to

aggravated burglary and merge the convictions to reflect one conviction for aggravated burglary. We remand the case to the trial court for resentencing and entry of amended judgments for Count 8 and the merged Counts 6 and 9.

We note that the record does not reflect judgments for Counts 2, 3, and 4, which were merged with Count 1 by the trial court. Consistent with our Supreme Court's order in *State v. Marquize Berry*, No. W2014-00785-SC-R11-CD, --- S.W.3d --- (Tenn. Nov. 16, 2015) (order), we remand for entry of judgments in Counts 2, 3, and 4 reflecting merger with Count 1.

_____
ROBERT H. MONTGOMERY, JR., JUDGE