IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 16, 2019

## STATE OF TENNESSEE v. MICHAEL D. FYKES

**Appeal from the Criminal Court for Davidson County**
**No. 2016-B-518     Monte Watkins, Judge**

---

**No. M2018-00703-CCA-R3-CD**

---

The defendant, Michael D. Fykes, appeals his Davidson County Criminal Court jury convictions of especially aggravated burglary and aggravated assault, arguing that the trial court erred by admitting certain evidence in violation of Tennessee Rule of Evidence 404(b) and imposing a sentence greater than necessary and that the evidence was insufficient to support the convictions.  Because dual convictions of especially aggravated burglary and aggravated assault in this case are prohibited by statute, we modify the conviction of especially aggravated burglary to aggravated burglary and remand to the trial court for resentencing.  We otherwise affirm the judgments of the trial court.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed as Modified**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and CAMILLE R. MCMULLEN, JJ., joined.

Manuel B. Russ (on appeal); and Nathan Cate (at trial), Nashville, Tennessee, for appellant, Michael D. Fykes.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Glenn Funk, District Attorney General; and Deborah Housel, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The Davidson County Grand Jury charged the defendant with especially aggravated burglary and aggravated assault arising from an incident in which the victim,

Mabline[1] Simmons, was attacked in her home.

At the August 1, 2018 trial, Ms. Simmons, who suffered from intermittent multiple sclerosis ("MS"), testified that on December 14, 2015, she lived at 903 Blue Ridge Drive in Davidson County. She had known the defendant for 30 years, describing their relationship as friendly. Although "at times . . . [they had] a romantic relationship," during the two months preceding the attack, she and the defendant were "just friends," and she "very seldom saw him then." The victim explained that the defendant was often out of town for work for a week or more at a time. She further explained that, in December 2015, the defendant did not live at nor have any items at her house; however, approximately a week before the attack, the defendant came to her house intoxicated. After that incident, the victim "packed up what little few items he had and put them in a box; and then when he came, [she] gave them to him." She testified that the defendant never had a key to her house.

At the time of the attack, the victim was unable to drive and would use a cane to walk but was otherwise able to care for herself. As therapy for her MS, the victim swam at the YMCA daily. On the day of the attack, Kenneth Crenshaw, the victim's friend, gave her a ride from her house to the YMCA, and when the victim left her house with Mr. Crenshaw, she saw the defendant parked in front of her house. She recalled thinking that the defendant "felt disrespected or something." While the victim was in the pool at the YMCA, the defendant arrived and said to her, "I ought to just jump in there and kill you right here in front of everybody," to which the victim replied, "[W]hy would you want to do that[?]" The defendant then spoke to the lifeguard before leaving. At that point, the victim "thought he was gone" and continued her exercises, used the sauna, and waited at the YMCA for her daughter to give her a ride home. The victim stated that her daughter drove her home but did not accompany her inside the house.

After returning home from the YMCA, the victim sat on her bed while she paid bills over the phone. She then "heard [the defendant] out the back window" of her bedroom calling to her to let him in. The victim refused to allow the defendant into the house, and the defendant told her that he would "just knock the window out." Although the victim "[n]ever thought he'd do nothing like that," she "heard this big crash" and "tried to run to the front door in the living room," but the defendant "came running in there and told [her to] leave the light out, cut the light out." The victim testified that the

---

[1] The victim spelled her name, "Mabeline" at trial but spelled it "Mauline" at the sentencing hearing. At other points in the record, her name was spelled "Mabline." We will use the spelling "Mabline" as stated in the indictment.

defendant began to hit her. At some point during the attack, the defendant permitted the victim to use the bathroom, but sat on a desk outside of the bathroom door and watched her. The defendant then resumed the attack, hitting the victim and "pulling [her] hair out from the root" and dragging her "through the hall, all the way through to the living room." The victim could not recall how long the attack lasted because "the time went away"; after the defendant hit her a second time, she "lost what was going on." The victim testified that she could hear the defendant "fussing and talking" but that she could not understand what he was saying because "it wasn't registering" with her. While the victim was lying on the floor after being dragged through the house, she heard a knock at the door, and the defendant went to answer the door at which time the attack stopped. Brandon Watson, the boyfriend of the victim's daughter, was at the door, and a short time later, the victim's daughter, Thomasina Gordon, arrived at her house as well. Ms. Gordon took the victim to the hospital, where she was treated for a broken nose and a fracture on the right side of her jaw among other injuries. The victim reported her pain at the time as being 10 out of 10 before being given pain medication. She was released from the hospital the following morning.

The victim recalled the beating lasting from the time the defendant entered her house to the time Mr. Watson knocked on the door. In addition to the broken nose and jaw, the victim suffered from chest pain and sustained permanent vision problems in her right eye. After being released from the hospital, the victim convalesced at Ms. Gordon's home for two weeks before returning to her own house. During her recovery, the victim "couldn't operate on [her] own," had to eat through a straw, and required assistance in basic tasks.

During cross-examination, the victim testified that she had had MS for about eight years, and, because the MS was intermittent, she did not always need to use a cane when walking. Prior to the attack, she had not had any issues with memory loss, but at the time of trial, she had trouble remembering dates and times. She acknowledged that, on the day of the attack, the defendant "had a few things" at her house but asserted that he "[d]idn't have that many clothes" and that "he didn't live with [her] constantly" at any point, but rather, he would "come over and visit." She testified that the defendant was living at her house for about three weeks but stated that he did not live there consistently because "he traveled so much, he would just be in town sometime[s]." He would stay at her house "[m]aybe for two or three days at a time."

The victim testified that her injuries included bruising to her face and chest. She recalled that the defendant had slapped her with an open hand during the attack but could not recall whether he had hit her with a closed fist; she confirmed that the defendant did not use a weapon. She could not recall how long the attack lasted but

stated that it was light outside when she saw the defendant outside of her window and that it was dark when she went to the hospital.

On redirect examination, the victim stated that the defendant knew that she had MS.

Mr. Watson testified that he was the boyfriend of Ms. Gordon and had known the victim for almost seven years. He lived within a one-minute walk from the victim's house. On the day of the attack, Ms. Gordon became concerned for the victim when she did not answer her phone calls. Mr. Watson went to the victim's house at approximately 8:00 p.m. to check on her and noted that the house was dark, which he thought was unusual because the victim usually kept "a lamp on by the window." The defendant answered the door, and Mr. Watson saw the victim lying on the floor. When he asked what was going on, the victim pointed at the defendant, and Mr. Watson told the defendant to leave, which he did. Mr. Watson helped the victim off of the floor and to her bedroom where he saw her injuries. He described the victim as "unrecognizable," explaining that "her hair was pulled out, her face was like extremely swollen," and "[s]he was bleeding from her nose and mouth." He also saw glass on the floor and on the bed and "a brick-o-block on the ground." The victim was "wincing in pain" and "crying out a little bit" but was otherwise unable to tell him what had happened.

Mr. Watson testified that he called Ms. Gordon and then called the police. Ms. Gordon arrived, and Mr. Watson had to carry the victim to the car to be taken to the hospital. While Ms. Gordon drove the victim to the hospital, Mr. Watson remained at the house for the police. He stated that he did not see the defendant again that night. After the victim was released from the hospital, she stayed at his house to recover from her injuries because she "couldn't really move" or eat. On cross-examination, Mr. Watson stated that the victim returned to living independently after two weeks.

Metro Nashville Police Department ("Metro") Officer Kyle Arndt testified that he responded to a call of a possible burglary at the victim's house, where he met Mr. Watson. After processing the scene, he went to the hospital to interview the victim, but she was able to speak only "[v]ery briefly" because "she was having a very difficult time speaking." He described the victim as having "visible injuries" and "just having a tough time talking." On cross-examination, Officer Arndt stated that the victim had already been taken to the hospital when he arrived at her house. He recalled the victim's telling him that the defendant did not live with her and had never spent the night at her house.

Metro Sergeant Kris Mason testified that, on the day of the attack, he was working as a patrol supervisor. According to precinct policy that required a patrol

-4-

sergeant to respond to a victim's location in domestic violence incidents, he went to the hospital to "view and document the injuries to the victim." He described the victim as having "significant injuries that were visible . . . about her head and face area." Although he asked the victim some questions about the attack, she was "unable to communicate" "because of the level of pain she was in." He recalled that the victim's "right eye was completely swollen shut. Her lips were busted fairly well and pretty swollen . . . [and] her head was very oblong shaped, like significant swelling or knots about her head." He stated, "[O]ut of all the domestic incidents I've responded to in my almost ten years with this police department, that's probably in my top five for visible injuries that I've encountered." While at the hospital, he photographed the victim's injuries, which photos were shown to the jury. In the photographs, he pointed out what "appear[ed to] be some choke marks" on the victim's neck.

The victim's medical records from her treatment following the attack were also admitted into evidence.

Ms. Gordon, who lived with Mr. Watson, testified that she was very close to the victim, seeing her about three times a week and talking with her every day. On the day in question, Ms. Gordon picked the victim up from the YMCA around 4:00 p.m. and drove her to the victim's house. She testified that the victim was able to get in and out of the car unassisted. When they arrived at the victim's house, Ms. Gordon waited in the car until she saw the victim go inside; Ms. Gordon then went home. At some point later that day, Ms. Gordon called the victim, but she did not answer. Ms. Gordon received two telephone calls from other people who said that the victim had also failed to answer her telephone. Because the victim had fallen in the past, Ms. Gordon would check on the victim when she failed to answer the telephone. That evening, Mr. Watson went to check on the victim. He called Ms. Gordon to report a truck in the victim's driveway. He called back a "little bit after that" and told Ms. Gordon to come to the victim's house. Upon arriving at the victim's house, Ms. Gordon found the victim lying on the bed, saw a shoe print on the victim's shirt, and saw that her face "was swollen all over and her eye was shut." She also noticed "some marks around her neck." She stated that the victim "wasn't really able to talk because . . . she didn't really have her breath" and because of the pain in her chest. The victim had defecated herself, and Ms. Gordon had to clean her up before taking her to the hospital.

Ms. Gordon testified that during the two weeks that the victim lived with her and Mr. Watson following the attack, the victim required help bathing and using the bathroom. She also was not able to chew and could only eat soup and ice cream. Ms. Gordon testified that the victim had tried to use glasses to correct her damaged vision, but they did not help. Other than the vision problem, all of the victim's injuries eventually

healed. Sometime after the attack, Ms. Gordon went to the victim's house and saw the broken glass on the floor and on the bed and chunks of the victim's hair in the bedroom and living room. Ms. Gordon stated that the defendant had never lived with the victim.

The jury found the defendant guilty of especially aggravated burglary and aggravated assault. After a sentencing hearing, the trial court merged the convictions and sentenced the defendant to 18 years' incarceration as a Range II offender. Following a timely but unsuccessful motion for a new trial, the defendant filed a timely notice of appeal. In this appeal, the defendant argues that the trial court improperly admitted a statement in violation of Tennessee Rule of Evidence 404(b), that the evidence adduced at trial was insufficient to support the convictions, and that the sentence was greater than necessary.

*I. Sufficiency*

The defendant contends that the State failed to present sufficient evidence to establish that he committed the offenses of especially aggravated burglary or aggravated assault. We disagree.

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979) (superseded on other grounds); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id*.

As charged in this case, especially aggravated burglary is defined as the "[b]urglary of a habitation . . . [w]here the victim suffers serious bodily injury." T.C.A. § 39-14-404(a). "A person commits burglary who, without the effective consent of the

-6-

property owner[,] . . . [e]nters a building . . . not open to the public, with intent to commit a felony, theft or assault." *Id.* § 39-14-402(a)(1). Aggravated assault occurs when a person "[i]ntentionally or knowingly commits an assault as defined in § 39-13-101, and the assault . . . [r]esults in serious bodily injury to another." *Id.* § 39-13-102(a)(1)(A)(i). "A person commits assault who . . . [i]ntentionally or knowingly causes another to reasonably fear imminent bodily injury." *Id.* § 39-13-101(a)(2).

## A. Entry Without Effective Consent

Here, the defendant argues that he resided at the victim's house and that the State failed to show that he lacked effective consent to enter the house. The jury, however, heard testimony that the defendant did not live at nor have a key to the victim's house, but rather he would "come over and visit" "[m]aybe for two or three days at a time." Furthermore, on the day of the attack, the defendant entered the victim's house by throwing a cinderblock through the bedroom window after the victim refused to allow him entry. This evidence is sufficient for a jury to conclude that the defendant did not reside at the house and that he entered without the victim's effective consent.

## B. Serious Bodily Injury

The defendant also argues that the victim's injuries did not amount to "serious bodily injury." The Code provides that "[s]erious bodily injury" includes: "[a] substantial risk of death; . . . [p]rotracted unconsciousness; . . . [e]xtreme physical pain; . . . [p]rotracted or obvious disfigurement; . . . [or p]rotracted loss or substantial impairment of a function of a bodily member, organ or mental faculty." T.C.A. § 39-11-106(a)(34)(A)-(E). The evidence at trial showed that the victim suffered significant swelling and pain, a broken nose, a fractured jaw, multiple contusions, and permanent vision impairment as a result of the assault. The victim testified that her pain was at a level 10 on a scale of one to 10, and other testimony established that the victim was unable to talk after the attack due to the severity of her pain. Additionally, the evidence showed that during her two-week recovery, the victim could eat only through a straw and required assistance to bathe or use the bathroom. This evidence is sufficient for a jury to conclude that the victim suffered serious bodily injury. *See id.*; *State v. Kenneth H. Laws*, No. E2003-01463-CCA-R3-CD, slip op. at 5 (Tenn. Crim. App., Knoxville, Apr. 20, 2004) (concluding that a victim's suffering "severe bruising, cuts, and a broken jaw" and experiencing "such pain that it prevented her from eating and sleeping" was sufficient to support a finding of serious bodily injury).

## C. Plain Error

Although we conclude that the evidence is sufficient to sustain the defendant's convictions for especially aggravated burglary and aggravated assault, we observe that Code section 39-14-404(d) prohibits dual convictions for these offenses when the same serious bodily injury is used to support both convictions. *See* T.C.A. § 39-14-404(d); *see also State v. Holland*, 860 S.W.2d 53, 60 (Tenn. Crim. App. 1993). Here, neither party has raised the issue, however, "[w]hen necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." Tenn. R. App. P. 36(b). This court will grant relief for plain error pursuant to Rule 36(b) only when:

> (1) the record clearly establishes what occurred in the trial court; (2) the error breached a clear and unequivocal rule of law; (3) the error adversely affected a substantial right of the complaining party; (4) the error was not waived for tactical purposes; and (5) substantial justice is at stake.

*State v. Cooper*, 321 S.W.3d 501, 506 (Tenn. 2010) (quoting *State v. Hatcher*, 310 S.W.3d 788, 808 (Tenn. 2010)). In this case, we conclude that substantial justice requires our consideration of this issue. *See* Tenn. R. App. P. 36(b); *State v. Tolbert*, 507 S.W.3d 197, 214 (Tenn. Crim. App. 2016).

Code section 39-14-404 provides that "[a]cts which constitute an offense under this section may be prosecuted under this section or any other applicable section, but not both." T.C.A. § 39-14-404(d). "[W]hen serious bodily injury to a victim is used to convict a defendant of both especially aggravated burglary and another offense requiring serious bodily injury, the especially aggravated burglary conviction must be reduced to aggravated burglary." *Tolbert*, 507 S.W.3d at 214 (citations omitted). Because the defendant was convicted of both especially aggravated burglary and aggravated assault predicated on the victim's suffering serious bodily injury, we modify his conviction of especially aggravated burglary to aggravated burglary. *See id.* at 214; *Holland*, 860 S.W.2d at 61.

## II. Admission of Evidence

Next, the defendant contends that the trial court erred by admitting certain evidence at trial contrary to the provisions of Tennessee Rule of Evidence 404(b). Specifically, the defendant posits that the trial court erred by denying his motion to

exclude prior bad act evidence in the form of a threatening statement he made to the victim at the YMCA a few hours before the attack, arguing that the statement had the effect of showing the defendant's propensity for violence with "no legitimate alternative purpose" and that its prejudicial effect outweighed any probative value.

During a jury-out hearing on the defendant's motion to exclude the evidence, the victim testified that, approximately two or three hours before the attack, the defendant approached the victim at the YMCA pool and said, "I ought to just jump in there and kill you right here in front of everybody." The defendant argued that the encounter at the pool and the attack at the victim's home were separate incidents that were "[i]dentical in nature" and "really close in proximity," precluding the admission of evidence of the defendant's conduct at the YMCA as a prior bad act under Rule 404(b). The State contended that the attack at the victim's house was "part of the continuing plan" and was the execution of "exactly what he said he was going to do." The trial court found that the statement was relevant to show the defendant's intent and motive and that its probative value was not outweighed by unfair prejudice because the statement was made during "actions that are part of a continuum." The court also found by clear and convincing evidence that the defendant made the threatening statement.

In this appeal, the defendant maintains that the statement he made at the YMCA was unnecessary to prove his intent or motive and that its prejudicial effect outweighed its probative value. The State contends that this evidence is not subject to 404(b) analysis because the incident at the pool and the attack at the victim's home were "all part of one criminal episode." Alternatively, the State argues that the probative value of the evidence was not outweighed by its prejudicial effect.

Rule 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes." Tenn. R. Evid. 404(b). Before such evidence may be admitted, however, the following procedure must be followed:

> (1) The court upon request must hold a hearing outside the jury's presence;

> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

*Id.* When the trial court substantially complies with the procedural requirements of Rule 404(b), this court will overturn the trial court's ruling only when there has been an abuse of discretion. *See State v. Thacker*, 164 S.W.3d 208, 240 (Tenn. 2005); *see also DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997). If, however, the strict requirements of the rule are not substantially observed, the reviewing court gives the trial court's decision no deference. *See id.*

In this case, although the trial court found that the incident at the YMCA and the attack at the victim's home were "part of a continuum," it nonetheless conducted a Rule 404(b) analysis and concluded that the testimony about the defendant's conduct at the YMCA was admissible. In doing so, the trial court fully complied with the procedural requirements for Rule 404(b). We agree with the State that the evidence in question is not subject to Rule 404(b) analysis. That being said, the trial court committed no error with regard to admitting evidence of the defendant's conduct at the YMCA. Even if we were to find that the evidence constituted a prior bad act, the record would support a finding that it was admissible to show the defendant's intent when he entered the victim's house. As stated above, a conviction for especially aggravated burglary required the State to prove that the defendant entered the victim's house "with intent to commit a felony, theft or assault." *See* T.C.A. § 39-14-402(a)(1).

*III. Sentencing*

Finally, the defendant contends that the trial court erred by imposing a sentence above the statutory minimum. The State argues that the defendant waived consideration of this issue by failing to provide a sufficient record on appeal. Although we have determined that the conviction for especially aggravated burglary must be reduced to aggravated burglary and the case remanded for resentencing, we consider this issue to facilitate further appellate review.

Moreover, we find that the defendant has waived our review of this matter by failing to provide an adequate record on appeal. Although the defendant supplemented the record with the transcript of the sentencing hearing, the record does not include the presentence investigation report that was exhibited to the hearing. The

appellant bears the burden of preparing an adequate record on appeal, *see State v. Ballard*, 855 S.W.2d 557, 560 (Tenn. 1993), which includes the duty to "have prepared a transcript of such part of the evidence or proceedings as is necessary to convey a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal," Tenn. R. App. P. 24(b).  If the appellant fails to file an adequate record, this court must presume the trial court's ruling was correct.  *See State v. Richardson*, 875 S.W.2d 671, 674 (Tenn. Crim. App. 1993).   Were we not remanding the case for resentencing, we would presume that the sentence imposed is appropriate because the record here does not include the presentence investigation report.

*IV.  Conclusion*

Accordingly, the defendant's conviction of especially aggravated burglary is modified to aggravated burglary and the case is remanded to the trial court for resentencing.  We affirm the judgments of the trial court in all other respects.

_____
JAMES CURWOOD WITT, JR., JUDGE