IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs August 27, 2019 at Knoxville

**STATE OF TENNESSEE v. EDWARD SPENCER III**

**Appeal from the Criminal Court for Davidson County**
**No. 2018-B-1450     Steve R. Dozier, Judge**

————————————————————

**No. M2018-02181-CCA-R3-CD**

————————————————————

The defendant, Edward Spencer III, was indicted for one count of aggravated burglary and one count of aggravated assault with a deadly weapon. Following a bench trial, the defendant was convicted of both offenses as charged. The trial court sentenced the defendant as a Range II offender and imposed an eight-year split confinement sentence, with the defendant to serve one year in jail followed by seven years of community corrections. On appeal, the defendant argues the evidence was insufficient to support his convictions. The defendant also contends the sentence of eight years was excessive. After our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and TIMOTHY L. EASTER, JJ., joined.

David von Wiegandt, Nashville, Tennessee, for the appellant, Edward Spencer III.

Herbert H. Slatery III, Attorney General and Reporter; M. Todd Ridley, Assistant Attorney General; Glenn Funk, District Attorney General; and J. Wesley King, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

A.  Trial

On May 1, 2018, at approximately 1:00 a.m., Officer Tyler Manivong arrived at the home of James Pippin after receiving a report of an attempted break-in. Mr. Pippin

rented a room inside a boarding house located at 67 Donaldson Street. The boarding house has a front door, which is the main entrance for the residents, and on the inside there is a long hallway with several bedrooms that are rented by the residents. The bedrooms do not have bathrooms; there are two bathrooms which are shared by the residents. Mr. Pippin lived in one of the bedrooms with his fiancée, Cassandra Degroat.

When Officer Manivong arrived at the boarding house, he noticed the front door to the boarding house was broken and the doorknob was lying on the ground. He also heard "a lot of banging and yelling" coming from inside. He entered the residence and found the defendant striking Mr. Pippin's bedroom door with a mallet. Mr. Pippin and Ms. Degroat were inside the bedroom. When asked about the damage to the bedroom door, Officer Manivong testified that "[t]he lock was knocked off and it was . . . dented in." Officer Manivong ordered the defendant to drop the mallet and surrender, and the defendant complied. The defendant appeared "very agitated" but "didn't necessarily seem intoxicated." Officer Manivong also noticed a wrench on the ground outside Mr. Pippin's bedroom, but he did not know if the wrench belonged to the defendant. When asked whether the bedroom door was ever opened, Officer Manivong testified, "[i]t was open a little bit, but it was due to the damage."

The defendant told Officer Manivong he damaged Mr. Pippin's door because he wanted to retaliate for Mr. Pippin damaging his door earlier that evening. Officer Manivong and the defendant then walked down the street to the defendant's residence and observed the defendant's front door was damaged "like someone put some type of blunt object to it." Officer Manivong did not arrest Mr. Pippin for the damage to the defendant's door because there were no witnesses to corroborate the defendant's claim that Mr. Pippin was responsible for the damage.

Mr. Pippin testified that he came home at approximately 1:00 p.m. on April 30, 2018, the afternoon before the incident and discovered his bedroom door was left open. He then walked down to the defendant's house to look for Ms. Degroat. When Mr. Pippin tried to get Ms. Degroat to leave with him, the defendant "raised up his shirt and showed me his pistol" and told Mr. Pippin to leave. After being threatened by the defendant, Mr. Pippin went home. He returned to the defendant's house at approximately 3:00 p.m. According to Mr. Pippen, when he returned the second time, the defendant shot at Mr. Pippin's truck.

Mr. Pippin called the police and requested they perform a welfare check on Ms. Degroat while she was at the defendant's house, although he was unsure whether he made the call before or after the defendant allegedly shot Ms. Degroat's truck. Mr. Pippin was also unclear regarding why he requested the welfare check. Initially, he testified that he called for the welfare check because it was the day of his and Ms.

Degroat's six-year anniversary. Later, Mr. Pippin testified he called for the welfare check because he suspected the defendant and Ms. Degroat were "getting high," and he wanted the police to catch them. He also testified he asked for the welfare check because Ms. Degroat has seizures. Once an officer arrived at the defendant's residence to conduct the welfare check and found Ms. Degroat fine, the officer escorted her to the boarding house to gather some items. Ms. Degroat then returned to the defendant's residence.

Later that evening, Mr. Pippin left the boarding house and went to the store. While at the store, Mr. Pippin spoke with Ms. Degroat over the phone. During their conversation, Ms. Degroat told Mr. Pippin "she was already ready to get out of the [defendant's] house. . . . she was scared once our truck got shot up." While at the store, Mr. Pippin saw the defendant. Mr. Pippin immediately left the store and picked up Ms. Degroat from the defendant's house, and they returned to the boarding house.

Mr. Pippin testified the defendant arrived at the boarding house at approximately midnight on May 1 with a mallet and "some other kind of metal thing." The defendant knocked on the front door to the boarding house, but when none of the residents let him in, "[the defendant] knocked down the front door," using the mallet to break the lock. The defendant entered the boarding house and approached Mr. Pippin and Ms. Degroat's bedroom door. He then struck their door with the mallet and said "[C]ome out here and fight like a man" and "[W]hen I get in there I'm going to kill you." Mr. Pippin testified he was afraid because "[the defendant] had shot at me earlier that day," and Mr. Pippin did not know if the defendant was still armed. Mr. Pippin and Ms. Degroat placed a dresser against the door to prevent the defendant from entering and called 911. The defendant broke off the door handle and the dead bolt, but the dresser kept him out long enough for the police to arrive. On cross-examination, Mr. Pippin admitted to having a prior conviction for a false police report and two convictions for theft.

The State also called Ms. Degroat to testify. When asked about the damage the defendant did to the bedroom door, Ms. Degroat testified, "[the defendant] kicked it down so hard, he actually moved the dresser to where we had to hold it." She stated the defendant's actions caused the door to open approximately two feet. She also stated she was "scared to death" because she "thought he was going to kill us" and thought the defendant might have brought his gun.

Regarding her presence at the defendant's house on April 30, 2018, Ms. Degroat testified the defendant "basically lured me out of my house" by telling her the police were coming and something bad was going to happen if she did not leave. Ms. Degroat corroborated Mr. Pippin's story that the defendant had threatened him with a pistol when Mr. Pippin came looking for Ms. Degroat. She testified she stayed at the defendant's house because she was afraid the defendant would shoot her if she tried to leave. She

- 3 -

also claimed she stayed because the defendant "made up this sarcastic lie that my husband was cheating on me with a prostitute and [the defendant] was going to bring her over there to verify that it was true." Ms. Degroat stated the welfare check happened before the defendant threatened Mr. Pippin with a gun, and therefore, she told the police she was fine.

Ms. Degroat also corroborated Mr. Pippin's story about the defendant shooting at her truck and then leaving to go to the store. She testified, "[a]s soon as he left, I left. I'm not going to get shot. He wasn't in his right state of mind." Although Mr. Pippin testified he went to the defendant's house to get Ms. Degroat, she testified Mr. Pippin left the store to meet her at the boarding house. The defendant then arrived at the boarding house "within two minutes" and began hitting the door with a mallet. When asked how the defendant's door was vandalized, Ms. Degroat stated, "I have no idea. I didn't even know it was vandalized." On cross-examination, Ms. Degroat admitted to having a prior conviction for theft of property over $10,000.

Officer Zachary Scott conducted a welfare check at the defendant's house at approximately 3:00 p.m. on April 30, 2018. At that time, he did not see any damage to the defendant's door. He testified Ms. Degroat did not appear afraid or upset, nor did she appear to need any medical assistance. Officer Scott walked with Ms. Degroat to the boarding house, where Mr. Pippin was present. Ms. Degroat grabbed her cell phone charger and "other miscellaneous items." Officer Scott did not recall where Ms. Degroat went after leaving the boarding house, but he testified Mr. Pippin stayed at the boarding house when Ms. Degroat left.

The defendant testified he first encountered Ms. Degroat on April 30, 2018, while he was mowing grass. Ms. Degroat approached the defendant, and after the two spoke for a few moments, they went to the defendant's house and "smoked a couple of cigarettes and shared a can of beer." After approximately thirty minutes, Mr. Pippin arrived at his house. Mr. Pippin smoked a cigarette and "then out of the blue he just told [Ms. Degroat], come on let's go," but she refused. The defendant testified Mr. Pippin "lunged and grabbed her," and the defendant separated the two. Mr. Pippin then stepped outside at the defendant's request. Ms. Degroat told the defendant she did not want to talk to Mr. Pippin because "he's been high and drinking all night." Mr. Pippin left, and Ms. Degroat stayed with the defendant at his house. The defendant denied having a gun.

Regarding the welfare check, the defendant testified Ms. Degroat left with the officer to retrieve some personal items from the boarding house. She then returned to his house with "a change of clothes, a laptop, a cell phone, a cigarette making machine, [and] a bag of loose tobacco . . . ."

- 4 -

At approximately 12:30 a.m. on May 1, 2018, the defendant went to the store, where he saw Mr. Pippin. According to the defendant, Mr. Pippin was leaving the store in Ms. Degroat's truck when "[Mr. Pippin] let down the window and said [']you black motherf***r, I'm going to send the Aryan Nation to your house['] . . . ." The defendant ran home from the store because he thought Mr. Pippin was going to his house. He testified, "[W]hen I got to the top of the hill I observed Mr. -- Mr. James Pippin kicking in my door, snatching Ms. Degroat up out of my home." The defendant testified he saw his door was "tore up" and became frustrated and wanted to retaliate.

The defendant admitted he went to the boarding house with a mallet "to destroy [Mr. Pippin's] door like he did mine." He testified destroying the door was his only intention and if he wanted to harm anyone inside he could have because "I destroyed the door so bad, it was nothing to keep me from entering the door." He admitted the damage he did to Mr. Pippin's door caused it to open. The defendant, however, denied threatening physical harm to Mr. Pippin or Ms. Degroat. He also denied shooting a gun at their truck or showing a gun to Mr. Pippin at any time. On cross-examination, the defendant admitted to having three prior felony convictions for forgery.

After considering all the evidence presented, the trial court found the State had proven beyond a reasonable doubt that the defendant was guilty of aggravated burglary and aggravated assault with a deadly weapon.

B. Sentencing

The defendant's mother, Patricia Dixon, testified at the sentencing hearing. She stated that she did not think the defendant had thought through his actions. Ms. Dixon testified the defendant had moved in with his grandmother at Ms. Dixon's request so that he could help take case of his grandmother, which he did for two or three years, until her death.

Ms. Dixon also testified the defendant has three children, is active in their lives, and tries to be a good father. She further testified the defendant is a good son, and she needs his help with yard work because of her age.

The defendant also testified at the sentencing hearing. He took full responsibility for his actions and blamed only himself. He realized his actions made Mr. Pippin and Ms. Degroat feel threatened, and he apologized to them. He stated that his children need him in their lives and that he is tired of living a life of crime.

The defendant admitted to three prior felony convictions for forgery, burglary, and possession with the intent to sell or deliver 0.5 grams of a Schedule II controlled

substance, as well as numerous misdemeanor convictions. The defendant also admitted to violating the terms of his probationary sentence on three prior occasions. The defendant acknowledged he had a positive drug screen while on probation. The defendant also noted that he completed a relapse prevention program while incarcerated and later enrolled in a post-incarceration return program.

The State requested the trial court apply enhancement factors for the defendant's previous history of criminal convictions and failure to comply with the terms of his probation. *See* Tenn. Code Ann. § 40-35-114(1), (8). The State recommended the defendant be incarcerated and serve his sentences consecutively.

The defendant conceded his status as a Range II offender but argued his sentences should be mitigated because he acted under strong provocation, the circumstances of the crimes were unusual and unlikely to happen again, and he had shown remorse for his actions, taken a relapse prevention class, and signed up for a return program. *See* Tenn. Code Ann. § 40-35-114(2), (11), (13). The defendant requested a sentence of six years on community corrections.

The trial court applied both enhancement factors submitted by the State but found the requested mitigating factors inapplicable. Based on these findings, the trial court sentenced the defendant as a Range II offender and imposed an eight-year split confinement sentence, with the defendant to serve one year in jail followed by seven years on community corrections. This timely appeal followed.

## ANALYSIS

On appeal, the defendant argues the evidence to convict him of aggravated burglary is "insufficient, as he never entered the residence of the victim." He also contends the trial court "improperly weigh[]ed the credibility of the witnesses, and therefore, his convictions should be vacated." Regarding the aggravated assault conviction, the defendant asserts the trial court failed to consider his intent when finding him guilty. Lastly, the defendant argues the sentence of eight years was excessive. The State, however, asserts the evidence is sufficient to sustain the defendant's convictions, and the trial court properly exercised its discretion in sentencing the defendant. After our review, we agree with the State.

I.      *Sufficiency of the Evidence*

When the sufficiency of the evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime

- 6 -

beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). Our Supreme Court has stated the following rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus, the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere, and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). "In a bench trial, the verdict of the trial judge is entitled to the same weight on appeal as a jury verdict." *State v. Holder*, 15 S.W.3d 905, 912 (Tenn. Crim. App. 1999); *State v. Hatchet*, 560 S.W.2d 627, 630 (Tenn. 1978).

## A. Aggravated Burglary

The defendant argues the evidence is insufficient to convict him of aggravated burglary because he "never entered Mr. Pippin's residence." He concedes he broke into the main entrance of the boarding house but argues "he is not charged with Aggravated Burglary of [the boarding house], just Mr. Pippin's residence." He cites the language of Count 1 of the indictment in support of this argument, which states that the defendant "without the effective consent of the property owner, did enter the habitation, or any portion thereof, of James A. Pippin, not open to the public, with the intent to commit an assault . . . ." We find the defendant's argument unpersuasive.

As charged in this case, aggravated burglary occurs when a person commits a knowing entry into a habitation without the consent of the owner and with the intent to commit a felony therein. *See* Tenn. Code Ann. § 39-14-402(a)(1); -403(a). "Habitation" means "any structure, including buildings, . . . which is designed or adapted for the overnight accommodation of persons" and "each separately secured or occupied portion of the structure." *Id*. § 39-14-401(1)(A), (C). "Hotels and boarding houses . . . are undoubtedly dwelling houses so as to make it burglary to break and enter an outer door with felonious intent[.]" *Wyatt v. State*, 467 S.W.2d 811, 814 (Tenn. Crim. App. 1971). Additionally, "a common area or hallway in an apartment building that is collectively secured from the general public is part of a dwelling house for the purposes of a breaking and entering statute." 12 C.J.S. *Burglary* § 44 (2019). "Owner" is defined as "a person in lawful possession of property whether the possession is actual or constructive." Tenn. Code Ann. § 39-14-401(3). Legal title to the property is irrelevant. *See State v. Ralph*, 6 S.W.3d 251, 255 (Tenn. 1999) ("Burglary is an offense against the security interest in possession of property rather than an offense against the legal title or ownership of the property."); *Hobby v. State*, 480 S.W.2d 554, 556 (Tenn. Crim. App. 1972) ("The specific owenership of the a building is not an essential element and title, as far as the law of burglary is concerned, follows the possession and possession constitutes sufficient owenership as against the burglar."). In other words, "[b]efore an accused can be convicted of aggravated burglary, the [S]tate must prove beyond a reasonable doubt that the accused (a) entered a "habitation," (b) without the consent of the person or persons occupying the "habitation," and (c) commits or intends to commit a felony or theft [or assault]." *State v. Teddy D. Thomas*, No. 03-C01-9410-CR-00394, 1995 WL 262099, at *5 (Tenn. Crim. App. May 5, 1995), *perm. app. denied* (Tenn. Sept. 5, 1995).

Here, the defendant concedes he entered the boarding house illegally by using a mallet to break the lock on the front door. The boarding house is Mr. Pippin's "habitation" for purposes of the statute. The defendant's argument assumes Mr. Pippin's habitation does not extend beyond his bedroom to other portions of the boarding house. However, Mr. Pippin's bedroom is located inside the boarding house, and he uses the main entrance to come and go from the residence and the community restroom located in the hallway outside of his bedroom. The boarding house as a whole, not just the bedrooms inside, is a "building[], . . . which is designed or adapted for the overnight accommodation of persons." *See* Tenn. Code Ann. § 39-14-401(1)(A). Based on the fact that the defendant could not enter the boarding house without help from a resident or without breaking down the door, is proof that the common areas – the main hallway, the bathrooms, and the main door – are collectively secured from the public. Thus, Mr. Pippin's ownership interest in his bedroom would extend to the common areas, including the main door. The fact that the defendant did not personally enter Mr. Pippin's bedroom is not of any significance. While Mr. Pippin is not the owner of the boarding house, his

habitation is more than his mere bedroom. Accordingly, the evidence is sufficient to support the defendant's conviction for aggravated burglary.[1]

## B. Aggravated Assault

The trial court also convicted the defendant of aggravated assault with a deadly weapon, a Class C felony. Aggravated assault occurs when a person intentionally or knowingly causes another to reasonably fear imminent bodily injury by using or displaying a deadly weapon. Tenn. Code Ann. §§ 39-13-101(a)(2), -102(a)(1)(A)(iii). A deadly weapon is "[a]nything that in the manner of its use or intended use is capable of causing death or serious bodily injury." *Id*. § 39-11-106(a)(5)(B). A person acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result." *Id*. § 39-11-302(a). A person acts knowingly "when the person is aware of the nature of the conduct or that the circumstances [surrounding the conduct] exist" or "when the person is aware that the conduct is reasonably certain to cause the result." *Id.* § 39-11-302(b).

The defendant contends the trial court failed to consider the defendant's intent. In support, he cites portions of the sentencing hearing transcript where the trial court stated as follows:

> The issue he is arguing, [the defendant], is he didn't have intent to commit an assault. But an assault is defined as -- he says all of his actions were intentional, he just didn't mean it to be an assault. But that element about an assault is addressed in terms of the definitional part of that is whether another person would reasonably fear bodily injury, would cause a reasonable person to be concerned about offensive touching, would they be concerned about bodily injur[y] . . . .

The defendant asserts that "this statement by the trial court shows that it disregarded [the defendant's] mens rea, and instead focused only on the mens rea of Mr. Pippin and Ms. Degroat." We disagree.

The trial court did not overlook the defendant's claim that he did not knowingly or intentionally place Mr. Pippin in fear. Rather, the above-referenced statement shows the trial court understood the defendant's claim yet also knew that a defendant need not

---

[1] Though not raised by either party, we note for clarification purposes that much like the aggravated robbery of a bank involving multiple tellers, the burglary of a boarding house, hotel/motel, or similar "habitation" constitutes one unit of prosecution. *State v. Tolbert*, 507 S.W.3d 197, 215 (Tenn. Crim. App. 2016) (the unit of prosecution for burglary is the number of entries, not the number of inhabitants inside a habitation).

intend for his actions to be an assault for an assault to occur. The trial court stated the defendant's conduct of striking the victims' bedroom door with a mallet and yelling "I'm going to kill you" would "obviously go to the intent [to] commit an assault." The defendant violently used a mallet while threatening the victims' lives. Both victims testified the defendant's conduct put them in fear and caused them to call 911. The weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *State v. Bland*, 958 S.W.3d 651, 659 (Tenn. 1997). Based on the verdict returned by the trial court, it is clear the trial court found the defendant did intentionally and knowingly assault Mr. Pippin and Ms. Degroat. This Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Accordingly, the evidence was sufficient for the trial court to find beyond a reasonable doubt that the defendant intentionally or knowingly caused the victims to reasonably fear imminent bodily injury by displaying a deadly weapon.

### C. Credibility of Witnesses

The defendant argues the trial court improperly assessed the credibility of the witnesses. He argues the testimonies of Mr. Pippin and Ms. Degroat "were entirely contradictory and inconsistent, and therefore, the court improperly weighed their testimony against [the defendant's testimony] and [the testimony] of the police officers'." First, the defendant argues his testimony about Ms. Degroat's reasons for going to the defendant's house was "the only testimony consistent with the facts." Next, he argues Mr. Pippin and Ms. Degroat provided multiple inconsistent stories regarding the welfare check of Ms. Degroat. He also argues Mr. Pippin's testimony that the defendant shot a gun at his truck "has no credibility, and it makes no sense." Finally, the defendant argues his testimony, not the testimony of Mr. Pippin or Ms. Degroat, corroborated the facts regarding his interaction with Mr. Pippin at the store and the break-in at the boarding house. As noted above, all questions involving the credibility of witnesses are resolved by the trier of fact. *Pappas*, 754 S.W.2d at 623. Accordingly, this Court will not reevaluate the trial court's determinations regarding the credibility of witnesses. *See id.*

## II.    Sentencing

Finally, the defendant argues the trial court "inaccurately applied enhancement and mitigating factors, and therefore, the sentence should be reduced from eight years to six years." Again, we disagree.

The trial court has broad discretion to impose a sentence anywhere within the applicable range, regardless of the presence or absence of enhancement or mitigating factors, and "sentences should be upheld so long as the statutory purposes and principles, along with any enhancement and mitigating factors, have been properly addressed."

*State v. Bise,* 380 S.W.3d 682, 706 (Tenn. 2012). Accordingly, we review a trial court's sentencing determinations under an abuse of discretion standard, "granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *Id.* at 707.

Under the 2005 amendments to the Sentencing Act, trial courts are to consider the following factors when determining a defendant's sentence and the appropriate combination of sentencing alternatives:

(1)     The evidence, if any, received at the trial and the sentencing hearing;
(2)     The presentence report;
(3)     The principles of sentencing and arguments as to sentencing alternatives;
(4)     The nature and characteristics of the criminal conduct involved;
(5)     Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;
(6)     Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and
(7)     Any statement the defendant wishes to make in the defendant's own behalf about sentencing;
(8)     The result of the validated risk and needs assessment conducted by the defendant and contained in the presentence report.

Tenn. Code Ann. § 40-35-210(b). Enhancement factors to be considered by the trial court include, but are not limited to, whether "[t]he defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range" and whether "[t]he defendant, before trial or sentencing, failed to comply with the conditions of a sentence involving release into the community." Tenn. Code Ann. § 40-35-114(1), (8). If a trial court misapplies an enhancement or mitigating factor in imposing a sentence, said error will not remove the presumption of reasonableness from its sentencing determination. *Bise*, 380 S.W.3d at 709.

The trial court must state on the record the factors it considered and the reasons for the ordered sentence. Tenn. Code Ann. § 40-35-210(e); *Bise,* 380 S.W.3d at 706. "Mere inadequacy in the articulation of the reasons for imposing a particular sentence . . . should not negate the presumption [of reasonableness]." *Bise,* 380 S.W.3d at 705-06. The party challenging the sentence on appeal bears the burden of establishing that the sentence was improper. Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.

The defendant argues the trial court should have applied the following mitigating factors: factor (2), "[t]he defendant acted under strong provocation," factor (11), "[t]he

defendant, although guilty of a crime, committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the criminal conduct," and factor 13, "[a]ny other factor consistent with the purposes of this chapter." *Id*. § 40-35-113(2), (11), (13).

At his sentencing hearing, the defendant called his mother as a character witness and then testified on his own behalf. During his allocution, the defendant asked the trial court for mercy and apologized to the victims. He took responsibility for his actions and requested that he be placed on probation rather than being incarcerated. Following the hearing, the trial court entered a detailed sentencing order containing its reasons for the sentence imposed. Both of the defendant's convictions are Class C felonies. The defendant does not dispute that he is a Range II offender.

The trial court first considered enhancement factors. The defendant's presentence report lists five pertinent prior felonies: three prior convictions for forgery, one prior conviction for possession with intent to sell a Schedule II drug, and one conviction for burglary. Furthermore, he failed to comply with the conditions of a sentence involving release into the community. Based on these enhancement factors and the trial court's finding that no mitigating factors applied, the trial court sentenced the defendant to eight years at thirty-five percent for Count 1 and the same for Count 2. The trial court ordered the defendant to serve his sentences concurrently for an effective sentence of eight years.

Our review of the record indicates that the trial court properly considered the evidence adduced at trial and the sentencing hearing, the presentence report, the principles of sentencing, the parties' arguments, the nature and characteristics of the crime, the statements of the defendant, and the evidence of enhancement factors. The trial court noted that the defendant had an extensive criminal history. The trial court further found the defendant had violated the terms of community release on multiple occasions. Based on these conclusions, the trial determined an effective within-range sentence of eight years was appropriate.

Upon our review, we conclude the trial court did not abuse its discretion when sentencing the defendant, a Range II offender, to an effective sentence of eight years in split-confinement. The defendant is not entitled to relief on this issue.

_____
J. ROSS DYER, JUDGE