IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
April 13, 2021 Session

**STATE OF TENNESSEE v. ANGELA KILGORE**

**Appeal from the Circuit Court for Marion County**
**No. 10397     Don R. Ash, Senior Judge**

_____

**No. M2020-00121-CCA-R3-CD**

_____

The Defendant, Angela Kilgore, was convicted by a jury of first degree premeditated murder, first degree felony murder, especially aggravated robbery, aggravated arson, and theft of property valued $2,500 or more but less than $10,000. After merging the felony murder conviction into the premeditated murder conviction, the trial court sentenced the Defendant to an effective term of life plus eighty years in the Department of Correction. On appeal, the Defendant argues that the trial court erred by overruling her motion to suppress the results of the search of her pickup truck, the evidence was insufficient to sustain her convictions for first degree murder, aggravated arson and especially aggravated robbery, her dual convictions for especially aggravated robbery and theft violate principles of double jeopardy, and the trial court erred in ordering consecutive sentences. We affirm the judgments of the trial court but remand for a corrected judgment in count six to reflect that the theft conviction merges into the conviction for especially aggravated robbery.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed
and Remanded**

JOHN EVERETT WILLIAMS, P.J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR. and CAMILLE R. MCMULLEN, JJ., joined.

M. Todd Riley, Assistant Public Defender-Appellate Division (on appeal), and B. Jeffery Harmon, District Public Defender, and Norman Lipton, Assistant District Public Defender (at trial), for the appellant, Angela Kilgore.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Senior Assistant Attorney General; Mike Taylor, District Attorney General; and Steve Strain and Sherry Shelton, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**FACTUAL AND PROCEDURAL BACKGROUND**

On the afternoon of May 17, 2016, firefighters with the Whitwell Volunteer Fire Department responded to a fire at a local pawnshop, Valley Pawn Brokers. After extinguishing the fire, they discovered the body of the seventy-two-year-old business owner, Mr. Jerry Ridge, who had been stabbed and shot to death and his body set on fire in the office area of the pawnshop. Shortly before the fire was reported, the Defendant was seen at the shop wearing purple nitrile medical gloves. That same night, the Defendant had fresh cuts on her hand. When she was arrested two days later, officers found her in possession of a large number of firearms from the pawnshop as well as a knife stained with the victim's blood. The victim's blood was also found on the Defendant's boots, on a shirt in the Defendant's pickup truck, and on an interior panel of the pickup truck. The Defendant's and the victim's DNA profiles were found in the pawnshop on a discarded bloody purple nitrile medical glove and on an empty can of lighter fluid. The Defendant was indicted for the first degree premeditated and felony murders of the victim, aggravated arson, especially aggravated robbery, employment of a firearm during the commission of a dangerous felony, felony theft, and possession of a firearm by a convicted felon. The State later dismissed the firearm count of the indictment.

**Suppression Hearing**

Prior to trial, the Defendant filed a "Motion to Suppress Search Warrant," arguing that the search warrant that resulted in the seizure of her 2015 Chevrolet Colorado pickup truck and items inside it was invalid because it did not specifically provide for the seizure of the truck and was not in the form prescribed by Tennessee Code Annotated section 40-6-106. She additionally argued that the "purported return" on the warrant was improper because it appeared "to be amended by way of the addition of the TBI lab reports and done well after the illegal seizure."

At the suppression hearing, Detective Chad Johnson of the Marion County Sheriff's Department testified that when applying for the warrant, he used a Tennessee Bureau of Investigation ("TBI") form as a template and added specific information pertaining to the case. He said the pickup truck was sent to the TBI laboratory on May 19, 2016, the day after the warrant was obtained, and he submitted and signed the return after the results came back from the TBI laboratory. He agreed that there was an active federal arrest warrant for the Defendant and that, as a convicted felon, it was illegal for her to be in possession of the firearms.

At the conclusion of the hearing, the trial court overruled the Defendant's motion to suppress, concluding that any omissions or errors in the warrant were essentially administerial and not fatal to the warrant. Earlier in the hearing, the court found that even if the warrant was defective in some way, the good faith exception applied.

**Trial**

Mr. David Sharpe, the victim's son-in-law, testified that the victim typically kept $5,000 to $10,000 in cash in a safe in his pawnshop for the daily operation of his business, but almost no cash was found in the business after the fire.

Mrs. Dale Watts, a retired nurse, testified that she and her young grandson saw the Defendant at the pawnshop between 2:45 and 3:30 on the afternoon of May 17, 2016. The victim was wearing purple nitrile medical gloves and told Mrs. Watts that it was part of her treatment for poison oak, which Mrs. Watts found odd, as it was not a treatment with which Mrs. Watts was familiar. The Defendant was driving a red pickup truck and was still at the pawnshop when Mrs. Watts and her grandson left at 3:30 p.m. On cross-examination, Mrs. Watts testified that the Defendant did not appear to be nervous and that the victim did not appear to be afraid of the Defendant.

Chief Roger Todd Brown of the Whitwell Volunteer Fire Department testified that he and his volunteer crew happened to be performing maintenance at the fire hall on May 17th when they were dispatched at 4:51 p.m. to the fire at the pawnshop. Because they were so close when the call came in, they arrived at the shop only three minutes later to find smoke coming from the eaves of the building. The glass front doors to the shop were closed and locked, but the outer metal security doors were open. After extinguishing the fire, which was confined to the office area, they discovered the victim's burned body on the floor near the safe.

Detective Matt Blansett of the Marion County Sheriff's Department identified photographs of the crime scene, which showed a large amount of fire damage primarily confined to the area around the victim's body. He testified that the pawnshop's blood-covered receipt book was on top of a display case with the last receipt, dated that day, made out to the Defendant in the amount of $4,000. He also found what appeared to be blood on the victim's Federal Firearms License ("FFL") log book, on which the victim recorded every firearm that legally entered and exited his pawnshop. On cross-examination, Detective Blansett acknowledged that firearms were found inside the pawnshop, as well as in a van parked outside the shop.

Mr. Jimmy Darin Rogers, who owned and operated a video and convenience store one block from the pawnshop, testified that law enforcement officers asked him on the

afternoon of the fire if he had seen a red truck with a rebel flag. He said he checked his surveillance cameras but was unable to find a clear image of a red truck. At about 9:00 p.m. that same day, the Defendant pulled up to his store in a truck matching the officers' description, got out, and casually asked him what was happening up the road. When he told her there had been a fire at the pawnshop, she told him that she had been there earlier that day to purchase some items. They were outside together by her pickup truck when she showed him a receipt from the pawnshop. He told her that law enforcement officers wanted to talk to her, and she waited at her truck while he called the police chief to inform him that she was at his store. The police chief, however, told him that they did not need to talk to the Defendant at that time, and the Defendant left.

Approximately one to two hours later, the Defendant returned to his store and went into the bathroom, where she remained for ten or twenty minutes. He noticed when she entered the store that she had a white bandage on her hand with blood seeping through the bandage. She was not wearing any gloves. A short time earlier, law enforcement officers called and asked him to let them know if he saw the Defendant again, so he contacted them. Officers arrived while the Defendant was still in the bathroom and waited outside the bathroom door for approximately five minutes until the Defendant emerged.

On cross-examination, Mr. Rogers acknowledged that the Defendant frequently visited his store and that there was nothing unusual about her appearance that day. She appeared calm and made no effort to flee, despite his informing her that law enforcement officers wanted to talk to her. He acknowledged that he and officers later searched the bathroom for keys the Defendant might have hidden but never found any.

TBI Special Agent Forensic Scientist Laura Hodge, an expert in the field of firearms identification and the leader of the violent crime response team that processed the crime scene, identified photographs of items she collected from the crime scene, including a lighter fluid can with reddish brown stains on it and a purple nitrile medical glove, also with reddish brown stains, that was found near the overturned trash can. She said she later determined that the bullet recovered from the victim's body was a .25 caliber bullet, but she was not able to match it to any weapon. On cross-examination, she acknowledged that crime scene photographs showed a pair of blue latex gloves left on the floor of the pawnshop after the victim's body was removed.

Investigator Daniel Foster of the Tennessee Fire Marshall's Office, an expert in fire investigation who had previously been employed with the Tennessee Bomb and Arson Division, testified that he collected three cans of charred debris from areas of the pawnshop on which his K-9 partner, a dog trained in the detection of fire accelerants, reacted. He explained that it was his practice to leave his gloves at each collection site and to photograph them to show that he avoided cross-contamination by using a fresh pair of

gloves for each collection. On cross-examination, he acknowledged that accelerants can include common household items.

TBI Special Agent Darby Hutchison, an expert in fire investigation, testified that she determined that the fire originated from the front side of the victim's body, which was found lying on its back near the safe. The victim was severely burned on the front of his body, with very little flesh remaining, and the burn patterns indicated that he had been set on fire after an accelerant was poured over him. The presence of the accelerant was verified by the K-9 officer, which she had brought in after her initial walk-through of the scene. Based on her investigation, she concluded that the fire had been intentionally set.

TBI Special Agent Kenneth Mark Wilson, the "ASAC" or Assistant Special Agent in Charge for the East Criminal Investigation Division, identified photographs of the crime scene that showed a large amount of blood on a filing cabinet, blood smears on a countertop, blood on the receipt book, the shop safe with a large amount of fire damage, and a Zippo lighter fluid can. He stated that he received word on the night of the fire that the Defendant was in the Raceway store in Whitwell, went there, and waited outside the bathroom for some time until the Defendant emerged. When she came out, he asked her to come to the Whitwell Police Department to talk to the investigators. The Defendant complied with his request, driving her own vehicle and giving him permission to look inside her vehicle.

Agent Wilson did not arrest the Defendant that night. He did, however, take photographs of the Defendant and her vehicle in the early morning hours of May 18, 2016, while she was at the police department. He identified the photographs, which showed, among other things, a cut on the Defendant's left palm, cuts on the fingers of the Defendant's right hand, a confederate flag license plate on the front of the Defendant's red Chevrolet Colorado pickup truck, decals on the rear window of the pickup truck, and the brown boots the Defendant was wearing that night. He also identified photographs of items he found in the Defendant's garage the next day after he had obtained and executed a search warrant for her residence. These included several items that were reflected on the pawnshop receipt as items the Defendant had purchased on the date of the fire: saddles, a bandsaw, and a pressure washer.

Agent Wilson testified that he was part of the team of law enforcement officers who arrested the Defendant on May 19, 2016, at Foster Falls State Park. He identified photographs of her truck's appearance at the time of her arrest, which showed that the decals had been removed from the rear window of the truck and the confederate license plate removed from the front of the truck. He also identified photographs of items found in the truck, which included: a black bag in the bed of her truck that contained an assortment of firearms; a Glock handgun and the confederate flag license plate, which were both found

in a green duffel bag in the backseat of her truck; and a Zippo lighter fluid can that was found in the interior of the truck. Agent Wilson stated that he submitted three of the firearms that had reddish brown stains on them to the TBI laboratory for analysis. He said there were an additional twelve firearms found in the truck that did not have any stains on them and were not submitted to the laboratory. He identified each weapon by its manufacturer, model, and serial number.

Agent Wilson also submitted to the TBI laboratory items that were recovered from the Defendant's person when she was booked into the jail. These included a three-bladed Case pocketknife, a black lock-blade knife, a one hundred dollar bill with reddish brown stains on it, two one dollar bills with reddish brown stains on them, and the Defendant's brown boots. Among the items found on the Defendant's person that he did not submit to the laboratory was a receipt dated May 17, 2016, made out to the Defendant in the amount of $4,000 that appeared to be a carbon copy of the last receipt in the pawnshop receipt book.

Agent Wilson further testified that he submitted to the TBI laboratory a gunshot residue kit collected from the Defendant and a knife with reddish brown stains that was found near the entrance of the pawnshop. He said that a latent print belonging to Mr. Jeremiah Totherow was lifted from the knife, but he was able to eliminate Mr. Totherow as a suspect.

On cross-examination, Agent Wilson acknowledged that the Defendant was cooperative when he met with her on the night of the fire. He agreed that on August 29, 2016, he submitted to the TBI laboratory a .25 caliber handgun that had been recovered from the pawnshop. He acknowledged that no blood or DNA was found on the black lock blade knife. He testified that blood stains and the DNA profiles of the victim and the Defendant were found on the Case pocketknife. He stated that he received information that the Defendant might have been wearing Sketchers at the time of the murder and collected some black Sketchers from the green duffle bag in the Defendant's truck but did not send them to the laboratory for analysis. He acknowledged that he submitted to the laboratory for analysis a broken rifle found in the pawnshop that appeared to have hair and fiber on it. Finally, he acknowledged that he learned that Mr. Totherow had been in the pawnshop on the day of the fire and that he cleared Mr. Totherow as a suspect based on information from Mr. Totherow's probation officer.

On redirect examination, Agent Wilson testified that he learned that Mr. Totherow had been in a meeting with his probation officer in Jacksboro, two hours and forty-five minutes from Whitwell, at 3:30 p.m. central time on May 17, 2016. On recross-examination, he acknowledged he made no attempt to track Mr. Totherow's movements by his cell phone records.

TBI Special Agent Forensic Scientist Cody Rowlett, an expert in latent prints, testified that he was able to lift only one identifiable latent print from all the evidence submitted in the case, which was Mr. Totherow's print from the knife found in the pawnshop.

Retired TBI Special Agent Forensic Scientist Russell Davis, an expert in the field of microanalysis who analyzed the gunshot residue kit that was collected from the Defendant at 11:59 p.m. on May 17, 2016, testified that he did not find the presence of any gunshot primer residue. He said, however, that he would not expect to find gunshot residue if the individual from whom the kit was collected had been wearing gloves.

TBI Special Agent Forensic Scientist Randall Nelson, an expert in microanalysis, testified that he detected the presence of ignitable liquids in three of the items submitted to the laboratory for analysis: a heavy petroleum distillate similar to diesel fuel or kerosene in a gas can found in the parking lot of the pawnshop; a medium petroleum distillate, which could have been used in the manufacturing process of the paper itself, on some burned receipts from the pawnshop; and a light petroleum distillate consistent with lighter fluid in the Zippo lighter fluid can. He did not find any ignitable fluid residue on the burned clothing of the victim but explained that if any ignitable fluid had been present, it could have burned away in the fire or been washed away in the process of extinguishing the fire. He said he found no ignitable fluid on the Defendant's shoes but did find something that may or may not have been ignitable fluid on the Defendant's boots. On cross-examination, he reiterated that he was not able to identify the substance on the boots and could not determine if it was an ignitable fluid.

Tennessee Board of Probation and Parole Officer Stephen Collins testified that Mr. Totherow met with him at his Jacksboro office at approximately 5:00 p.m. eastern time on May 17, 2016. Mr. Totherow had been scheduled to arrive earlier in the afternoon but showed up so late in the workday that Officer Collins did not record the visit in his computer system until the following day. On cross-examination, Officer Collins acknowledged that he initially told the investigating officers that his meeting with Mr. Totherow was May 18, 2016, because that was the date on which he entered the meeting into his computer. He said he corrected the error several weeks later after checking his records and the log of phone calls he had made to Mr. Totherow on the afternoon of May 17 to inquire why he was late.

TBI Special Agent Forensic Scientist Lisa Burgee, an expert in forensic biology, testified that she found the DNA profile of the victim on several blood spots on the Defendant's boots. She also found the DNA profile of the victim on a blood stain on the hinge of the three-bladed Case pocketknife and a mixture of two DNA profiles, with the

- 7 -

victim being the major contributor and a second unidentifiable minor contributor, on another blood-stained area of a knife blade. On the purple nitrile glove, she found two blood stains with a mixture of two DNA profiles, with the victim as a major contributor and another unidentified minor contributor, and a third blood stain on the palm with the victim's DNA profile alone. She swabbed the finger section of the glove for touch DNA and found a mixture of the Defendant's and the victim's DNA profiles. She also found the victim's DNA on blood-stained paper towels that were found in the pawnshop and a mixture of at least two DNA profiles, with the Defendant the major contributor and an unidentified male as a limited minor contributor, on the front of the lighter fluid can found in the pawnshop.

Agent Burgee testified she found the victim's DNA profile on a blood stain below the speaker on the rear passenger door of the Defendant's truck, the Defendant's and the victim's DNA profiles, along with a third unidentified profile, on a blood stain on a blue plaid shirt found in the Defendant's truck, the Defendant's DNA profile, along with an unidentified male, on a second blood stain on the shirt, and a mixture of two DNA profiles, with the victim the major contributor, on a third blood stain on the shirt. She found the Defendant's DNA profile on a bloodstain on the one hundred dollar bill and a mixture of two DNA profiles, with the Defendant the major contributor and an unidentified minor contributor, on two bloodstains on one of the one dollar bills. She found the DNA profile of the Defendant on blood stains on all three firearms that were submitted for analysis. She found the presence of human blood on several areas of the broken rifle. She did not find any blood or DNA on the lock blade knife.

On cross-examination, Agent Burgee acknowledged that skin cells produce the same DNA profile as blood cells. She further acknowledged the existence of touch and transfer DNA and her inability to determine from a DNA profile how an individual's DNA was deposited on an object. She conceded that anything was possible but testified that, in her experience, a major contributor DNA profile obtained from a blood stain was the result of the large amount of DNA present in blood.

Deputy Paige Durham of the Marion County Sheriff's Department, who was working as a correctional officer on May 19, 2016, when the Defendant was brought into the jail, identified a photograph of the two knives and other miscellaneous items that were collected into evidence at the time the Defendant was booked into the jail.

Detective Roger Chad Johnson of the Marion County Sheriff's Department testified that all the firearms seized from the Defendant, with the exception of a BB gun, appeared in the victim's FFL log book as guns that had entered the pawnshop but that none appeared in the log book as sold. He determined that the approximate total value of the firearms was

$4,728.00. On cross-examination, he acknowledged that Ms. Felicia Totherow's name was in the FFL log book as having sold a gun to the victim.

Dr. Thomas Deering, the medical examiner who autopsied the victim's body, testified that the victim died as a result of a knife stab wound to his left upper neck in which the left internal jugular vein was cut, which, he said, would have led to continuous bleeding at a "modest level." He listed as a contributing cause of death a gunshot wound to the victim's right upper arm that caused a comminuted fracture of the bone and possibly severed major veins and arteries. Because he did not find any soot in the trachea or esophagus or carbon monoxide in the blood, he determined that the victim was dead before he was burned.

TBI ASAC Kenneth Wilson, recalled as a witness for the defense, identified a photograph of the Defendant's garage that showed a box of latex gloves, swabs, and syringes. He acknowledged that the gloves in the box were blue rather than purple.

Mr. Ronald Inglis testified that he saw an older model red Chevrolet pickup truck backed up to the door of the pawnshop when he was driving past at approximately 4:45 p.m. on May 17, 2016. Based on his knowledge of Chevrolet designs, he estimated that the truck was a 2005 or older model, with headlights more rounded to the center of the hood than the headlights on the Defendant's newer truck. On cross-examination, he acknowledged that there was no stop light near the pawnshop and that he merely glanced at the truck as he drove past in a forty or forty-five-mile-per-hour speed zone.

Mr. Randy Mosier testified that on May 17, 2016, he was in the pawnshop between 1:15 to 1:45 or 2:00 p.m. talking to the victim when a red truck pulled in and backed up to the door and the Defendant came in wearing blue gloves. He asked the Defendant why she was wearing the gloves, and she told him that she had poison oak on her hands. He left the shop approximately ten minutes later. Everything was normal and neither the Defendant nor the victim appeared nervous. He could not recall if he told investigators that the Defendant had been wearing sneakers but said it was possible he did.

The Defendant elected not to testify in her own defense. Following deliberations, the jury convicted her of the charged offenses.

**Sentencing Hearing**

At the November 2018 sentencing hearing, the State introduced certified copies of the Defendant's prior felony convictions and a copy of her presentence report, which reflected that the fifty-three-year-old Defendant, in addition to misdemeanor convictions, had prior 1990 Tennessee felony convictions for aggravated robbery and aggravated assault

and 2004 federal convictions for felon in possession of a firearm, attempted bank robbery, and possessing a firearm in relation to a violent crime. The presentence report further reflected that the Defendant was on supervised release from her federal sentences at the time she committed the instant offenses.

At the conclusion of the hearing, the trial court merged the Defendant's felony murder conviction into the premeditated murder conviction and sentenced the Defendant to life imprisonment. The court found that the Defendant was a Range II multiple offender and that several enhancement factors were applicable to the offenses but that there were no applicable factors in mitigation. The court, therefore, sentenced the Defendant at the upper end of her range to forty years for the especially aggravated robbery conviction, forty years for the aggravated arson conviction, and eight years for the theft conviction. Finding that the Defendant was an offender with an extensive criminal record, that she was a dangerous offender, and that she committed the instant offenses while on supervised release from her federal sentences, the trial court ordered that the forty-year sentences for aggravated arson and especially aggravated robbery be served consecutively to each other and consecutively to the life sentence for first degree murder. The court ordered the sentence for theft served concurrently to the sentence for aggravated arson, for a total effective sentence of life plus eighty years. Finally, the court ordered that the Tennessee sentence be served consecutively to the federal sentence in the event the Defendant's term of supervised release in the federal case was revoked.

## ANALYSIS

### I. Denial of Motion to Suppress

The Defendant first contends that the trial court erred in denying her motion to suppress, asserting that the search warrant did not authorize the officers to seize and conduct chemical testing on her truck and its contents. She argues that the search warrant violated both the procedural requirements of Rule 41 of the Tennessee Rules of Criminal Procedure and the state and federal constitutions because, although the warrant named the property to be searched, it failed to specifically name or describe the property to be seized. By her reasoning, the search warrant's failure to specifically state that the officers were authorized to seize the truck and its contents meant that the officers were limited to a "basic search of the vehicle."

The trial court's findings of fact at the conclusion of a suppression hearing are binding upon this court unless the evidence preponderates against them. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). "Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Id.* The State, as the prevailing party in the trial court,

"is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." *Id.* This court's review of the trial court's application of law to the facts is de novo with no presumption of correctness. *State v. Talley*, 307 S.W.3d 723, 729 (Tenn. 2010).

Under both the Tennessee and United States Constitutions, no search warrant may be issued except upon probable cause, which has been defined as "a reasonable ground for suspicion, supported by circumstances indicative of an illegal act." *State v. Henning*, 975 S.W.2d 290, 294 (Tenn. 1998). Tennessee requires a written and sworn affidavit, "containing allegations from which the magistrate can determine whether probable cause exists," as "an indispensable prerequisite to the issuance of a search warrant." *Id.* Under the totality-of-the-circumstances test, the issuing magistrate is required to "'make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *State v. Tuttle*, 515 S.W.3d 282, 303-04 (Tenn. 2017) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)) (internal quotations omitted).

The search warrant described in detail the property to be searched, authorizing the officers to search the Defendant's pickup truck, identified by make, model, color, registered owner and vehicle identification number, for the following:

1. Any blood, hair, fiber, DNA, or trace/transfer evidence, keys to pawn shop, cell phones, any firearms or other similar items or other possible murder weapon, including but not limited to firearms, any US currency, financial records, clothing, ammunition, any clothing with or containing any type of blood splatter, or any other item associated with the victim believed to be Jerry Ridge (DOB June 04, 1943), or any other physical evidence related to the homicide of the victim believed to be Jerry Ridge

2. Any evidence or items that would be used to conceal the foregoing or prevent its discovery.

The search warrant did not specifically state that the officers were authorized to seize items found in the search or the truck itself. The Defendant argues that this omission rendered the seizures and subsequent laboratory analyses illegal and required suppression of that evidence. In support, she relies on the language of Tennessee Rule of Criminal Procedure 41, which states in pertinent part:

- 11 -

(A) The warrant shall, as the case may be, identify the property or place to be searched, or name or describe the person to be searched; the warrant also shall name or describe the property or person to be seized.

(B) The search warrant shall command the law enforcement officer to search promptly the person or place named and to seize the specified property or person.

Tenn. R. Crim. P. 41(c)(3)(A)-(B).

The Defendant asserts that the officers' own actions demonstrate that they exceeded the scope of the search warrant because, after returning a perfunctory inventory immediately after the seizure, Detective Johnson supplemented the return months later with detailed TBI forensic reports. The Defendant argues that the execution of the warrant was not completed until the results of the laboratory tests, months after the warrant was issued, in violation of Tennessee Code Annotated section 40-6-107(a), which provides that a search warrant shall be executed and returned within five days of its issuance.

The State characterizes these arguments as unreasonable, unrealistic, and unsupported by any precedent, and cites cases from Tennessee and California in which the appellate courts focused on a commonsense approach to omitted words in a search warrant. *See State v. Melson*, 638 S.W.2d 342, 353 (Tenn. 1982) (concluding that a commonsense approach showed that the search warrant, which omitted the phrase "boxes and containers," was meant to authorize the search of the truck's contents) and *People v. Superior Court (Nasmeh)*, 59 Cal. Rptr. 3d 633, 642 (Cal. Ct. App. 2007) (concluding that "a valid warrant to search a vehicle brings with it authorization to seize it for the time reasonably necessary to undertake the lawful search" and that taking the vehicle to a crime laboratory "to search for and conduct a scientific analysis of trace items did not offend the Fourth Amendment.").

We agree with the State. The fact that the search warrant omitted the word "seize" did not render the search warrant invalid or the seizure of the truck and items inside it illegal. A logical, commonsense reading of the warrant, which described in great detail objects that would necessarily require laboratory analysis, shows that the warrant was meant to authorize the search and seizure of the items. We conclude, therefore, that the trial court properly overruled the motion to suppress.

## II. Sufficiency of the Evidence

The Defendant next challenges the sufficiency of the evidence in support of her first degree premeditated murder, aggravated arson and especially aggravated robbery convictions. When a defendant challenges the sufficiency of the evidence, the relevant

question for this court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). On appeal, "'the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom.'" *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Therefore, this court will not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Instead, it is the trier of fact, not this court, who resolves any questions concerning "the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). This court applies the same standard of review regardless of whether the conviction was predicated on direct or circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011). "Circumstantial evidence alone is sufficient to support a conviction, and the circumstantial evidence need not exclude every reasonable hypothesis except that of guilt." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012).

## A. First Degree Premeditated Murder

The Defendant contends that her first degree premeditated murder conviction cannot stand because the State failed to establish the element of premeditation. She asserts that the strongest and only real evidence the State presented of premeditation was the burning of the pawnshop and argues that concealment of evidence of a crime, without more, is insufficient to prove premeditation.

To sustain the conviction for premeditated murder, the State had to prove beyond a reasonable doubt that the Defendant committed an intentional and premeditated killing of the victim. T.C.A. § 39-13-202(a)(1). Premeditation requires that the act be "done after the exercise of reflection and judgment" and committed when the accused "was sufficiently free from excitement and passion as to be capable of premeditation." T.C.A. § 39-13-202(d). Whether premeditation exists is a factual question for the jury to determine from all the evidence, including the circumstances surrounding the killing. *State v. Davidson*, 121 S.W.3d 600, 614 (Tenn. 2003). Our supreme court has provided a non-exclusive list of factors from which a jury may infer premeditation, including the defendant's declarations of an intent to kill, evidence of the procurement of a weapon, the defendant's use of a weapon on an unarmed victim, the particular cruelty of the killing, evidence of the

- 13 -

infliction of multiple wounds, the defendant's preparation before the killing to conceal the crime, destruction or secretion of evidence after the killing, and the defendant's calmness immediately after the killing. *State v. Nichols*, 24 S.W.3d 297, 302 (Tenn. 2000). Additional evidence from which a jury may infer premeditation is establishment of a motive for the killing. *State v. Leach*, 148 S.W.3d 42, 54 (Tenn. 2004).

Viewed in the light most favorable to the State, the evidence showed that the Defendant attempted both before and after the killing to conceal and destroy evidence that might link her to the crimes by wearing medical gloves as she entered the shop and setting the victim's body on fire and locking the doors behind her as she departed the shop, that she killed the seventy-two-year-old unarmed victim in a brutal manner by stabbing him in the neck with a pocketknife and shooting him in the arm, and that she appeared very calm immediately after the killing, nonchalantly asking the video store owner what was happening at the pawnshop and showing him the receipt she had received earlier that afternoon from the victim. The evidence further showed that the Defendant was found in possession of a large number of firearms from the pawnshop and that there was very little cash found in the shop after the fire, thus establishing a possible motive for the killing. This evidence was sufficient for the jury to find that the Defendant's killing of the victim was premeditated. We conclude that the evidence is sufficient to sustain the Defendant's first degree premeditated murder conviction.

## B.  Aggravated Arson

The Defendant contends that the evidence was insufficient for the jury to find her guilty of aggravated arson rather than arson. To sustain the conviction for aggravated arson, the State had to prove beyond a reasonable doubt that the Defendant "knowingly damage[d]" the pawnshop "by means of a fire or explosion" and "one (1) or more persons [were] present therein." T.C.A. §§ 39-14-301(a), -302.

The Defendant cites the medical examiner's testimony that the victim was dead before he was burned to argue that the proof was insufficient to satisfy the required element of one or more persons being present in the pawnshop. However, as the State points out, our supreme court has held that the presence of the arsonist alone is sufficient to satisfy this element of the crime. In *State v. Nelson*, 23 S.W.3d 270, 271 (Tenn. 2000), our supreme court noted that "[t]he plain language of the aggravated arson statute includes not only victims of the aggravated arson but also the perpetrator of the act of arson." In *State v. Lewis*, 44 S.W.3d 501, 507-8 (Tenn. 2001), our supreme court again observed that "[a]rson is elevated to aggravated arson merely by the presence of a single person in the structure" and that "an aggravated arson can occur in the absence of a 'victim'" as "only a person's presence is required[.]" Moreover, the jury in this case could have reasonably found based on the proof that the victim was still alive when the Defendant set the fire,

although he succumbed to his injuries before he breathed in any smoke. *See, e.g.*, *State v. Vaughan*, 144 S.W.3d 391, 415 (Tenn. Crim. App. 2003) (concluding that the victim qualified as a "person" for purposes of the aggravated arson statute when there was evidence that she may have been alive at the time the defendant initiated the fire even though she died before her body sustained fire damage). We conclude that the evidence is sufficient to sustain the Defendant's conviction for aggravated arson.

### C. Especially Aggravated Robbery

The Defendant contends that the evidence is insufficient to sustain her conviction for especially aggravated robbery because there was no proof that the victim sustained serious bodily injury during the commission of the theft. She asserts that the State at most established that the victim was killed and that guns from his pawnshop were found in the Defendant's possession. She argues that there was only the slightest circumstantial evidence, essentially amounting to speculation, of any link between those two events.

Especially aggravated robbery is robbery accomplished with a deadly weapon and where the victim suffers serious bodily injury. T.C.A. § 39-13-403(a). Robbery is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." T.C.A. § 39-13-401(a). "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." T.C.A. § 39-14-103(a). "A robbery can involve the taking of property from the physical body of a person, in which a person has actual possession of the property, or from a person's immediate presence or the general area in which the victim is located, in which the person has constructive possession of the property." *State v. Tolbert*, 507 S.W.3d 197, 217 (Tenn. Crim. App. 2016) (citations omitted).

We respectfully disagree with the Defendant's characterization of the circumstantial evidence in this case as weak and speculative. Viewed in the light most favorable to the State, the evidence established that sometime between 3:30 and 4:51 p.m. on May 17, 2016, the Defendant stabbed and shot the victim, causing his death, during the course of stealing a large assortment of valuable firearms and possibly cash from the pawnshop. We conclude that the evidence is sufficient to sustain the Defendant's conviction for especially aggravated robbery.

### III. Dual Convictions for Especially Aggravated Robbery and Theft

The Defendant contends, and the State concedes, that the trial court should have merged her theft conviction into the conviction for especially aggravated robbery because

both convictions were based on the taking of the same property, the firearms from the pawnshop. We agree.

The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution provides that "[n]o person shall . . . be subject for the same offen[s]e to be twice put in jeopardy of life or limb[.]" The Tennessee Constitution similarly provides that "no person shall, for the same offen[s]e, be twice put in jeopardy of life or limb." Tenn. Const. art. I, § 10. Thus, "[m]erger is required when a jury returns verdicts of guilt on two offenses and one of the guilty verdicts is a lesser-included offense of the other offense." *State v. Berry*, 503 S.W.3d 360, 362 (Tenn. 2015). "It is uncontested that theft is a lesser-included offense of robbery." *State v. Bowles*, 52 S.W.3d 69, 79 (Tenn. 2001).

Accordingly, we remand to the trial court for entry of a corrected judgment to reflect that the theft conviction merges into the conviction for especially aggravated robbery.

## IV. Consecutive Sentences

Lastly, the Defendant contends that the trial court erred in imposing consecutive sentences. She argues that the trial court erred in its finding that she was a dangerous offender, in ordering that her state sentence be served consecutively to a federal sentence that was a mere contingency, and by not making findings that a life plus eighty-year sentence was "the least severe measure necessary" and "no greater than that deserved for the offense committed." T.C.A. § 40-35-103(2),(4).

This court reviews challenges to the length of a sentence under an abuse of discretion standard, "granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). A trial court abuses its discretion when it applies an incorrect legal standard, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the party complaining. *State v. Herron*, 461 S.W.3d 890, 904 (Tenn. 2015). This court will uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. The standard of review for consecutive sentencing is abuse of discretion with a presumption of reasonableness. *State v. Pollard*, 432 S.W.3d 851, 859 (Tenn. 2013). "So long as a trial court properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal." *Id.* at 862. The appealing party bears the burden of proving that the sentence was improper. *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

A trial court may order multiple sentences to run consecutively if it finds by a preponderance of evidence that any one or more of the seven factors listed in Tennessee Code Annotated section 40-35-115(b) applies, including the three factors that the trial court found in this case: the Defendant was an offender whose record of criminal activity was extensive; the Defendant was a dangerous offender whose behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high; and the Defendant is sentenced for an offense committed while on probation.   T.C.A. § 40-35-115(b)(2),(4),(6). Consecutive sentencing also is "guided by the general sentencing principles providing that the length of a sentence be 'justly deserved in relation to the seriousness of the offense' and 'no greater than that deserved for the offense committed.'" *State v. Imfeld*, 70 S.W.3d 698, 708 (Tenn. 2002) (quoting T.C.A. §§ 40-35-102(1), -103(2)).

The Defendant first complains that the trial court failed to make the necessary additional findings for the imposition of consecutive sentences under the dangerous offender category.  When the court bases consecutive sentencing upon its classification of the defendant as a dangerous offender, it must also find that an extended sentence is necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences reasonably relate to the severity of the offense committed.  *State v. Lane*, 3 S.W.3d 456, 460-61 (Tenn. 1999); *State v. Wilkerson*, 905 S.W.2d 933, 937-38 (Tenn. 1995).  While the trial court did not explicitly make the additional *Wilkerson* findings in conjunction with its finding that the Defendant was a dangerous offender, it implicitly made such findings throughout the sentencing hearing, including as it reviewed the applicable enhancement factors.  In any event, the factors in the consecutive sentencing statute are listed in the alternative, and, thus, a finding of any one single factor is sufficient for a trial court to order consecutive sentences.  The Defendant does not challenge the trial court's classification of her as an offender with an extensive record or as an offender who committed the offense while on probation.

The Defendant next complains that the trial court erred in ordering that her state sentences be served consecutively to a federal sentence that had not yet been ordered into effect, arguing that it is not possible for her to be ordered to serve her state sentence consecutively "to some unknown possibility."  As the State points out, the Defendant cites no law in support of this position.  We agree with the State that this issue has no merit.

Finally, the Defendant complains that a sentence of life plus eighty years is too severe, especially given the fact that she was already fifty-two-years-old at the time of the offenses, which means that a life sentence is effectively a sentence of life without parole. In support of her position that partially consecutive sentences result in a sentence that is too harsh, the Defendant cites *State v. Biggs*, 482 S.W.3d 923, 927-28 (Tenn. Crim. App. 2015), in which this court reversed the trial court's imposition of partially consecutive

sentences on the basis that the resulting sentence was not justly deserved in relation to the seriousness of the crimes nor the least severe measure necessary to achieve the purposes for which the sentence was imposed.

We agree with the State that the Defendant's reliance on *Biggs* is misplaced. In that case, the Defendant, who had no prior violent convictions, committed the robberies with a toy gun, and none of the victims were injured. *Id.* The record in this case, by contrast, clearly supports a determination that the aggregate length of the sentence was reasonably related to the seriousness of the Defendant's crimes and the least severe measure necessary to achieve the purposes for which the sentences were imposed. The Defendant, who was on supervised released from her violent federal crimes at the time of the instant offenses, stabbed the seventy-two-year-old victim in the neck with a pocketknife, shot him in the arm, doused his body with lighter fluid, set him on fire, and locked the pawnshop doors behind her, presumably to delay firefighter response and/or to prevent the victim's escape, as it is highly unlikely that the Defendant ascertained that the victim was dead before she set him on fire. Accordingly, we affirm the sentences as imposed by the trial court.

## CONCLUSION

Based on the foregoing, we remand for entry of a corrected judgment in count six to reflect that the theft conviction merges into the conviction for especially aggravated robbery. In all other respects, the judgments of the trial court are affirmed.

_____
JOHN EVERETT WILLIAMS, PRESIDING JUDGE